# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-1541

_____

Belcourt Public School District; Angel Poitra

*Plaintiffs - Appellants*

v.

Ella Davis

*Defendant - Appellee*

Turtle Mountain Tribal Court

*Defendant*

_____

No. 14-1542

_____

Belcourt Public School District

*Plaintiff - Appellant*

v.

Erica Malaterre

*Defendant - Appellee*

Turtle Mountain Tribal Court

*Defendant*

_____

No. 14-1543

_____

Belcourt Public School District; Chris Parisien

*Plaintiffs - Appellants*

v.

Mike Nelson; Judy Nelson on behalf of their Minor Child S.N.

*Defendants - Appellees*

Turtle Mountain Tribal Court

*Defendant*

_____

No. 14-1545

_____

Belcourt Public School District; Roman Marcellais; School Board Members for
the Belcourt Public School District

*Plaintiffs - Appellants*

v.

Bruce Allard; Martin Desjarlais; Jeff Laducer; Chad Marcellais; Robert St. Germaine

*Defendants - Appellees*

Turtle Mountain Tribal Court

*Defendant*

-2-

_____

No. 14-1548
_____

Belcourt Public School District; Roman Marcellais; School Board Members for
the Belcourt Public School District

*Plaintiffs - Appellants*

v.

Steve Herman

*Defendant - Appellee*

Turtle Mountain Tribal Court

*Defendant*

_____

Appeals from United States District Court
for the District of North Dakota - Bismarck

_____

Submitted: December 10, 2014
Filed: May 15, 2015

_____

Before BYE, SMITH, and KELLY, Circuit Judges.

_____

SMITH, Circuit Judge.

Plaintiff-Appellants, Belcourt Public School District ("School District") and
certain of its employees, brought an action against Defendant-Appellees, members

of the Turtle Mountain Band of Chippewa Indians ("Tribe") and the Turtle Mountain Tribal Court ("Tribal Court"), seeking (1) a declaration that the Tribal Court lacks jurisdiction over claims that the Tribe members filed against Plaintiff-Appellants in Tribal Court, and (2) injunctions prohibiting the prosecution of the claims before the Tribal Court. Plaintiff-Appellants also moved for default judgment against one of the Tribe members. The district court denied the motion for default judgment and found that the Tribal Court had jurisdiction. For the reasons stated herein, we affirm in part and reverse in part.

## I. *Background*

The School District is a political subdivision of the State of North Dakota, *Bismarck Pub. Sch. Dist. #1 v. State By and Through N.D. Legislative Assembly*, 511 N.W.2d 247, 251 (N.D. 1994), that operates within the exterior boundaries of the Turtle Mountain Indian Reservation ("Reservation"). The Constitution of North Dakota requires that the School District provide education to all children in North Dakota, including children who are Indians or reside on Indian reservations. N.D. Const. art. VIII, § 1 ("[P]ublic schools [ ] shall be open to all children of the state of North Dakota . . . .").

The Tribe and School District have agreed to mutually share the responsibility for educating students, both Indian and non-Indian, residing on the Reservation. Accordingly, the Tribe and School District entered into agreements ("Plans of Operations") in both 2006 and 2009 that provided the School District with exclusive authority to administer the "day-to-day operations" of the Turtle Mountain Community High School ("Grant High School"), subject to applicable laws. This arrangement vested the School District with exclusive administrative authority over, among other things, the supervision and employment of staff at Grant High School.[1]

---

[1]Although both the School District and Grant High School operate within the boundaries of the Reservation, it is unclear in the record what, if any, of their

-4-

Several Tribe members filed suit against the School District and its employees in Tribal Court, alleging defamation, excessive use of force, and multiple employment-related claims. The Tribal Court ultimately dismissed the claims pursuant to the United States Supreme Court's decision in *Nevada v. Hicks*, 533 U.S. 353 (2001), on the grounds that the Tribal Court lacked jurisdiction over the School District and its employees for claims related to the employees' performance of their official duties. On appeal, however, the Turtle Mountain Tribal Court of Appeals ("Tribal Court of Appeals") reversed the Tribal Court's decision, finding that *Hicks* was not dispositive in part because the School District signed the Plans of Operations, thereby subjecting itself to Tribal jurisdiction.[2] The School District and its employees thereafter filed actions in federal court, seeking (1) a declaration that the Tribal Court lacks jurisdiction over the claims, and (2) injunctions prohibiting the Tribal members from pursuing the claims and likewise prohibiting the Tribal Court from adjudicating them.

The School District and its employees later moved for default judgment in one of the actions ("*Nelson*" action) based on the defendants' alleged failure to defend against the claims. The district court exercised its discretion to deny the motion,

facilities or the land on which the facilities are located belong to the Tribe. Per the Plans of Operations, however, it is clear that some but not all of the property used by Grant High School is "federally owned."

[2]Upon completion of the Tribal Court of Appeals' appellate review, all requisite tribal remedies were exhausted. *Strate v. A-1 Contractors*, 520 U.S. 438, 449 (1997) ("[A] federal court should stay its hand until after the Tribal Court has had a full opportunity to determine its own jurisdiction." (quotation omitted)). The School District and its employees were not required to fully litigate the merits of the claims before seeking review of the Tribal Court's jurisdiction in federal court. *Strate*, 520 U.S. at 459 n.14 (exhaustion not required when, among other things, it "would serve no purpose other than delay").

however, holding that, at least in that case, "default judgment is not the appropriate avenue" to issue declaratory relief.

The School District and its employees then moved for summary judgment in all of the actions. The district court ultimately denied the motions and concluded that the Tribal Court, in fact, had jurisdiction over the claims. In so holding, the district court found inapplicable the United States Supreme Court's decision in *Montana v. United States*, 450 U.S. 544 (1981). It further found that, even if *Montana* were applicable, the Tribal Court would nevertheless have jurisdiction because the School District entered into the Plans of Operations with the Tribe.

## II. *Discussion*
### A. *Tribal Court Jurisdiction*

The School District and its employees argue on appeal that the Tribal Court lacked jurisdiction over them and, consequently, that the district court erred in denying their motions for summary judgment. We review de novo a district court's denial of summary judgment. *Solomon v. Petray*, 699 F.3d 1034, 1038 (8th Cir. 2012) (citation omitted). "The extent of tribal court subject matter jurisdiction over claims against nonmembers of the Tribe is a question of federal law which we review de novo." *Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe of Miss. in Iowa*, 609 F.3d 927, 934 (8th Cir. 2010) (citation omitted).

No federal statute or a treaty specifically provides the Tribal Court with jurisdiction over the claims at issue in this case; therefore, the Tribal Court's jurisdiction must arise from its "retained or inherent sovereignty." *Atkinson Trading Co., Inc. v. Shirley*, 532 U.S. 645, 649–50 (2001). We analyze the contours of a tribal court's inherent jurisdiction over nonmembers of the tribe within the framework and principles set forth in *Montana*, which remains the "'pathmarking case'" on the subject. *Hicks*, 533 U.S. at 358 (quoting *Strate*, 520 U.S. at 445). In *Montana,* the Supreme Court addressed whether a tribe could prohibit hunting and fishing activities

by non-Indians on reservation land owned in fee simple by non-Indians. As a general matter, the Court held, "the inherent sovereign powers of an Indian tribe *do not* extend to the activities of *non*members of the tribe." 450 U.S. at 565 (emphases added). The Court then noted, however, two relatively narrow exceptions to this general rule:

> To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, *the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements*. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that *conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.*

*Id.* at 565–66 (emphases added) (internal citations omitted).[3] These two categories of nonmember conduct that Indian tribes may regulate are commonly referred to as the "*Montana* exceptions." The Court in *Montana* ultimately found that neither exception provided the tribe with jurisdiction over non-Indians' hunting and fishing on non-Indian land. *Id.* at 566.

Given the general rule set forth and applied in *Montana*—that a tribe's inherent sovereign powers do not vest it with jurisdiction over the activities of nonmembers—the Tribal Court presumably does not have jurisdiction over the claims asserted in this case. "The burden rests on the tribe" to establish that one of the

_____

[3] The Tribal Court's jurisdiction cannot exceed the Tribe's regulatory power. *See Strate,* 520 U.S. at 453 ("As to nonmembers, we hold, a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction."); *Attorney's Process*, 609 F.3d at 936 (tribal court jurisdiction "turns upon whether the actions at issue in the litigation are regulable by the tribe" (quoting *Hicks*, 533 U.S. at 367 n.8)).

*Montana* exceptions applies. *Plains Commerce Bank v. Long Family Land & Cattle Co*., 554 U.S. 316, 330 (2008).

### 1. *First* Montana *Exception*

The School District agreed to provide educational services to students residing on the Reservation, as memorialized, at least in part, in the Plans of Operations. But these agreements between the School District and the Tribe do not alone confer jurisdiction on the Tribal Court under the first *Montana* exception. Notably, North Dakota law specifies that a school district *cannot* "[a]uthorize an agreement that enlarges or diminishes the jurisdiction over civil or criminal matters that may be exercised by . . . tribal governments located in North Dakota." N.D. Cent. Code § 54–40.2–08. The agreements do not state that the School District intended to, or represented that it could, deviate from North Dakota law.

Moreover, even assuming arguendo that the School District *could* agree to an expansion of Tribal Court jurisdiction under North Dakota law, the first *Montana* exception still would not provide the Tribal Court with jurisdiction. Indeed, in *Hicks,* the Supreme Court elaborated on the first *Montana* exception and specified that, "[r]ead in context, an 'other arrangement' is clearly another *private consensual* relationship . . . ." 533 U.S. at 359 n.3 (holding that a tribal court lacked jurisdiction over claims asserted against state officials who executed a search warrant on tribal land to search for evidence of an off-reservation crime). To resolve lingering ambiguities as to what constitutes an "other arrangement" under the first *Montana* exception, the Court further stated that:

> The [*Montana*] Court (this is an opinion, bear in mind, not a statute) *obviously did not have in mind States or state officers acting in their governmental capacity; it was referring to private individuals who voluntarily submitted themselves to tribal regulatory jurisdiction* by the arrangements that they (or their employers) entered into. This is confirmed by the fact that all four of the cases in the immediately

following citation involved private commercial actors. *See* [*Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 152 (1980)] (nonmember purchasers of cigarettes from tribal outlet); [*Williams v. Lee*, 358 U.S. 217 (1959)] (general store on the Navajo reservation); [*Morris v. Hitchcock*, 194 U.S. 384 (1904)] (ranchers grazing livestock and horses on Indian lands "under contracts with individual members of said tribes"); *Buster v. Wright*, 135 F. 947, 950 (8th Cir. 1905) (challenge to the "permit tax" charged by a tribe to nonmembers for "the privilege . . . of trading within the borders").

*Id.* at 372 (emphasis added).

The Tribe members nevertheless contend that the requisite "consensual relationship" existed under the first *Montana* exception because the School District entered into *contracts* (that is, the Plans of Operations) with the Tribe. But they are mistaken. The Ninth and Tenth Circuits have held that contractual agreements between tribes and government entities do not constitute "consensual relationships" within the meaning of the first *Montana* exception. In *County of Lewis v. Allen*, for instance, the Ninth Circuit, en banc, held that a tribal court lacked jurisdiction over a tribal member's civil claims against a political subdivision of a state stemming from his arrest on reservation land—even though the arrest was made pursuant to a specific law enforcement contract between the state and the tribe. 163 F.3d 509, 514–16 (9th Cir. 1998) (en banc). In so holding, the court noted that "*Montana'*s exception for suits arising out of consensual relationships has never been extended to contractual agreements between two government entities . . . . [T]he Agreement between the tribe and the state is not a "'consensual relationship' of the qualifying kind." *Id.* at 515 (quotation marks omitted) (quoting *Strate*, 520 U.S. at 457). Likewise, in *MacArthur v. San Juan County*, the Tenth Circuit held that employment relationships that were "contractual in nature" between a state's political subdivision and two tribe members "were not '*private* consensual relationships' . . . and [therefore] do not fall within the first *Montana* exception." 497 F.3d 1057, 1071, 1074 (10th Cir. 2007).

More recently, in *Red Mesa Unified School District v. Yellowhair*, a district court reached the same conclusion in a case remarkably similar to this case. There, two school districts operating on Indian reservations filed for declaratory and injunctive relief in federal court to prohibit a tribal administrative tribunal from deciding employment-related claims filed against the school districts. No. CV-09-8071-PCT-PGR, 2010 WL 3855183, at *2 (D. Ariz. Sept. 28, 2010). The court granted the relief and specifically found that the first *Montana* exception did not apply—notwithstanding a lease agreement between the school districts and the tribe—because the school districts "made the employment decisions at issue while operating in their governmental capacities pursuant to their state constitutionally-imposed mandate to operate a public school system within the reservation boundaries." *Id.* at *3.

We agree with these well-reasoned decisions. The School District in this case was clearly acting in its official capacity and, specifically, in furtherance of its obligations under the Constitution of North Dakota to make public education "open to all children of the state of North Dakota," *see* N.D. Const. art. VIII, § 1, when it entered into the agreements relevant to this case. The agreements therefore do not fall within the ambit of the first *Montana* exception.[4]

### 2. *Second* Montana *Exception*

Because there is no private consensual relationship between the School District and the Tribe, the Tribal Court will have jurisdiction only if the claims at issue involve "conduct [that] threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at

---

[4]To be clear, we are not ruling out the possibility that a state and a tribe could enter into an agreement that confers jurisdiction upon the tribe—such as an agreement that expressly provides for such jurisdiction. But no such agreement is at issue in the instant case.

-10-

566. In conducting this analysis, we note at the outset that not every event that impacts a tribe's political integrity, economic security, health, or welfare will necessarily give rise to tribal court jurisdiction; indeed, a lax application or overly broad reading of the second *Montana* exception would render meaningless *Montana*'s general rule that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Id.* at 565. The Court in *Hicks* emphasized the necessarily narrow scope of the second *Montana* exception when it confirmed that, "[w]here nonmembers are concerned, the 'exercise of tribal power *beyond what is necessary to protect tribal self-government or to control internal relations* is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.'" 533 U.S. at 359 (quoting *Montana*, 450 U.S. at 564); *see also Plains Commerce Bank*, 554 U.S. at 330 (noting that the *Montana* exceptions "are limited ones, and cannot be construed in a manner that would swallow the rule, or severely shrink it") (quotations omitted).

In *Plains Commerce Bank*, the Court further elucidated the circumstances necessary for the second *Montana* exception to apply. There, the Court held that the second *Montana* exception did *not* apply to a non-Indian bank's sale of land on a tribal reservation to another non-Indian because:

> The conduct must do more than injure the tribe, it must "*imperil the subsistence*" of the tribal community. [*Montana*, 450 U.S. at 566]. One commentator has noted that "th[e] elevated threshold for application of the second *Montana* exception suggests that tribal power must be *necessary to avert catastrophic consequences*." Cohen § 4.02[3][c], at 232, n.220.

*Id*. at 341 (emphases added).[5]

_____

[5]Of course, the transaction at issue in *Plains Commerce Bank* involved land that non-Indians owned in fee simple both before and after the transaction, and this

-11-

The claims and alleged conduct at issue in this case clearly do not "imperil the subsistence" of the Tribe, and Tribal Court jurisdiction is not "necessary to avert catastrophic consequences." Other courts have found the second *Montana* exception inapplicable to conduct that was either comparable or more detrimental to a tribe's subsistence and well-being than the conduct alleged in this case.[6]

---

court is aware that "[t]he ownership status of land" is "one factor to consider in determining whether regulation of the activities of nonmembers is 'necessary to protect tribal self-government or to control internal relations.'" *Hicks*, 533 U.S. at 360. As noted above, however, there is scant evidence in the record what, if any, land and facilities relevant to this case were owned by the Tribe. Nevertheless, even if the Tribe owned all of the land and facilities relevant to this case—which is not supported by the record—*Montana* would still apply, *see Attorney's Process*, 609 F.3d at 935–41, and our analysis would not change for the reasons stated herein.

[6]*See Evans v. Shoshone-Bannock Land Use Policy Comm'n*, 736 F.3d 1298, 1305 (9th Cir. 2013) (holding that the second *Montana* exception did not apply to non-Indian conduct that allegedly caused, among other things, "groundwater contamination" and "improper disposal of construction debris"); *MacArthur,* 497 F.3d at 1075 (holding that "[w]hile the Navajo Nation undoubtedly has an interest in regulating employment relationships between its members and non-Indian employers on the reservation, that interest is not so substantial in this case as to affect the Nation's right to make its own laws and be governed by them"); *Allen*, 163 F.3d at 515–16 (9th Cir. 1998) (en banc) ("Having divested itself of sovereignty over the very activities that gave rise to the civil claim, nothing in this case can be seen as threatening self-government or the political integrity, economic security or health and welfare of the tribe. . . . Indian tribes or their members . . . may pursue their causes of action in state or federal court."); *Otter Tail Power Co. v. Leech Lake Band of Ojibwe*, No. 11-1070 DWF/LIB, 2011 WL 2490820, at *5 (D. Minn. June 22, 2011) (holding that the second *Montana* exception did not apply to nonmember conduct that would interfere with the tribe's "hunting, fishing, and gathering rights"); *Dolgencorp Inc. v. Miss. Band of Choctaw Indians*, 846 F. Supp. 2d 646, 650 (S.D. Miss. 2011) (holding that the second *Montana* exception did not apply to a case in which a nonmember of the tribe allegedly molested a minor tribe member), *aff'd*, 746 F.3d 167 (5th Cir. 2014).

In sum, the Tribe members have failed to carry their burden of establishing that either of the *Montana* exceptions apply. We therefore hold that the Tribal Court lacked jurisdiction over the Tribe members' claims.

## B. *Default Judgment*

The School District and its employees also contend that the district court erred in not granting their motion for default judgment in the *Nelson* action. We review the district court's decision for an abuse of discretion. *Taylor v. City of Ballwin, Mo.*, 859 F.2d 1330, 1332 (8th Cir. 1988) (citation omitted).

"The Federal Rules of Civil Procedure commit the entry of a default judgment against a party to the sound discretion of the trial court." *F.T.C. v. Packers Brand Meats, Inc.*, 562 F.2d 9, 10 (8th Cir. 1977) (per curiam) (citations omitted); *see also* Fed. R. Civ. P. 55(b)(2). This court has recognized that default judgments are "not favored by the law and should be a rare judicial act." *In re Jones Truck Lines, Inc.*, 63 F.3d 685, 688 (8th Cir. 1995) (citations and quotation marks omitted). Put simply, there is a "judicial preference for adjudication on the merits." *Johnson v. Dayton Elec. Mfg. Co.*, 140 F.3d 781, 784 (8th Cir. 1998) (citations and quotation marks omitted).

There are various factors courts may consider when determining whether to enter a default judgment, including:

> [T]he amount of money potentially involved; whether material issues of fact or issues of substantial public importance are at issue; whether the default is largely technical; whether plaintiff has been substantially prejudiced by the delay involved; and whether the grounds for default are clearly established or are in doubt. Furthermore, the court may consider how harsh an effect a default judgment might have; or whether the default was caused by a good-faith mistake or by excusable or inexcusable neglect on the part of the defendant.

*Briarpatch Ltd., L.P. v. Geisler Roberdeau, Inc.*, 513 F. Supp. 2d 1, 3 (S.D.N.Y. 2007) (alteration in original) (citation omitted).

In light of these considerations and the judicial preference for adjudication on the merits, we conclude that the district court did not abuse its discretion in denying the motion for default judgment. In particular, we note that the scope of Tribal Court jurisdiction was a central issue in each of the actions brought by the School District and its employees—including the *Nelson* action—and that the district court issued its opinion with respect to Tribal Court jurisdiction shortly after denying the motion for default judgment. It was well within the district court's discretion to choose to resolve all of the actions in the same order.

### III. *Conclusion*

For the foregoing reasons, and after thoroughly considering all of the parties' contentions on appeal, we reverse the district court's decision with respect to Tribal Court jurisdiction and remand for further proceedings. We affirm the district court's denial of default judgment in the *Nelson* action.

——————————————————