**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| WINDOW ROCK UNIFIED SCHOOL DISTRICT; PINON UNIFIED SCHOOL DISTRICT, <br><br> *Plaintiffs-Appellees*, <br><br> v. <br><br> ANN REEVES; KEVIN REEVES; LORETTA BRUTZ; MAE Y. JOHN; CLARISSA HALE; MICHAEL COONSIS; BARBARA BEALL, <br><br> *Defendants*, <br><br> and <br><br> RICHIE NEZ; CASEY WATCHMAN; BEN SMITH; WOODY LEE; JERRY BODIE; EVELYN MEADOWS; UNKNOWN PARTIES, named as John and Jane Does I–V (Current or former members of the Navajo Nation Labor Counsel), <br><br> *Defendants-Appellants*. | No. 13-16259 <br><br> D.C. No. 3:12-cv-08059-PGR |

| | |
|---|---|
| WINDOW ROCK UNIFIED SCHOOL DISTRICT; PINON UNIFIED SCHOOL DISTRICT, *Plaintiffs-Appellees*, | No. 13-16278 D.C. No. 3:12-cv-08059-PGR |
| v. | |
| ANN REEVES; KEVIN REEVES; LORETTA BRUTZ; MAE Y. JOHN; CLARISSA HALE; MICHAEL COONSIS; BARBARA BEALL, *Defendants-Appellants*, | OPINION |
| and | |
| RICHIE NEZ; CASEY WATCHMAN; BEN SMITH; WOODY LEE; JERRY BODIE; EVELYN MEADOWS; UNKNOWN PARTIES, named as John and Jane Does I–V (Current or former members of the Navajo Nation Labor Counsel), *Defendants.* | |

Appeal from the United States District Court
for the District of Arizona
Paul G. Rosenblatt, Senior District Judge, Presiding

Argued and Submitted September 17, 2015
Submission Vacated January 5, 2016
Resubmitted June 28, 2017
San Francisco, California

Filed June 28, 2017

Before: Consuelo M. Callahan, Morgan Christen,
and Michelle T. Friedland, Circuit Judges.

Opinion by Judge Friedland;
Dissent by Judge Christen

## SUMMARY[*]

### Tribal Jurisdiction

The panel reversed the district court's decision enjoining tribal forum proceedings on employment-related claims against two Arizona public school districts operating schools on leased tribal land.

The panel held that it was "colorable or plausible" that the tribal adjudicative forum, the Navajo Nation Labor Commission, had jurisdiction because the claims arose from conduct on tribal land over which the Navajo Nation had the right to exclude nonmembers, and the claims implicated no state criminal law enforcement interests. Well-established exhaustion principles therefore required that the tribal forum have the first opportunity to evaluate its own jurisdiction, including the nature of the state and tribal interests involved.

The panel reaffirmed that there exist two distinct frameworks for determining whether a tribe has jurisdiction over a case involving a non-tribal-member defendant: (1) the right to exclude, which generally applies to nonmember

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

conduct on tribal land; and (2) the exceptions articulated in *Montana v. United States*, 450 U.S. 544 (1981), which generally apply to nonmember conduct on non-tribal land. The panel held that *Nevada v. Hicks*, 533 U.S. 353 (2001) (addressing concerns related to enabling state officers to enforce state criminal laws for crimes that occurred off the reservation), did not eliminate the right-to-exclude framework, such that jurisdiction over a nonmember exists only if a *Montana* exception applies, regardless of whether the relevant conduct occurred on tribal or non-tribal land. The panel held that the court's caselaw left open the question of what state interests might be sufficient to preclude tribal jurisdiction over disputes arising on tribal land; therefore, tribal jurisdiction was plausible enough that exhaustion was required.

The panel reversed the district court's summary judgment in favor of the plaintiff school districts and remanded with instructions to dissolve the injunction and dismiss the case for failure to exhaust.

Dissenting, Judge Christen wrote that the majority's opinion created a split with the Seventh, Eighth, and Tenth Circuits. She wrote that tribal jurisdiction was neither colorable nor plausible because *Montana* and the Supreme Court authority that followed it make clear that the inherent sovereign powers of Indian tribes generally do not extend to the activities of nonmembers. Judge Christen wrote that she disagreed with the majority's holding that unless a state is seeking to enforce its criminal laws, *Montana* does not apply to nonmember conduct on tribal land even in the presence of clear competing state interests. In addition, the majority gave short shrift to the school districts' obligation to operate public schools within the Navajo Reservation's boundaries.

**COUNSEL**

Paul Spruhan (argued), Navajo Nation Department of Justice, Window Rock, Arizona, for Defendants-Appellants Richie Nez, Casey Watchman, Ben Smith, Woody Lee, Jerry Bodie, and Evelyn Meadows.

David R. Jordan, Law Offices of David R. Jordan P.C., Gallup, New Mexico, for Defendants-Appellants Ann Reeves, Kevin Reeves, Loretta Brutz, Mae Y. John, Clarissa Hale, Michael Coonsis, and Barbara Beall.

Eileen Dennis GilBride (argued) and Georgia A. Staton, Jones Skelton & Hochuli P.L.C., Phoenix, Arizona; Patrice M. Horstman, Hufford Horstman Mongini Parnell & Tucker P.C., Flagstaff, Arizona; for Plaintiffs-Appellees.

Josephine Foo, Office of the Chief Justice, Judicial Branch of the Navajo Nation, Window Rock, Arizona, for Amicus Curiae Navajo Nation Supreme Court.

---

**OPINION**

FRIEDLAND, Circuit Judge:

This appeal requires us to decide whether it is "colorable or plausible" that a tribal adjudicative forum has jurisdiction over employment-related claims against two public school districts operating schools on leased tribal land. Because the claims arise from conduct on tribal land and implicate no state criminal law enforcement interests, we conclude that tribal jurisdiction is colorable or plausible under our court's interpretation of *Nevada v. Hicks*, 533 U.S. 353 (2001). Well-established exhaustion principles therefore require that

the tribal forum have the first opportunity to evaluate its own jurisdiction over this case, including the nature of the state and tribal interests involved. We thus reverse the district court's decision enjoining tribal forum proceedings.

# I.

The question of tribal jurisdiction arose when a group of current and former employees (the "Employees") of two Arizona public school districts, Window Rock Unified School District and Pinon Unified School District (the "Districts"), filed complaints with the Navajo Nation Labor Commission (the "Commission").

The Districts both operate schools on land leased from the Navajo Nation (the "Nation"). Window Rock's lease requires the school district to abide by Navajo laws, to the extent that they do not conflict with Arizona or federal law, and it further provides that the agreement to abide by Navajo laws does not forfeit any rights under state or federal laws. Pinon's lease with the Nation does not mention Navajo law.

In their complaints before the Commission, some of the Employees alleged that the Districts owed them merit pay under Arizona law and others alleged that the Districts had violated their rights under the Navajo Preference in Employment Act.[1] The Commission eventually consolidated all of the Employees' complaints.

The Districts moved to dismiss the complaints on the ground that the Commission lacked jurisdiction over personnel decisions made by Arizona public school districts. Following a motion hearing, the Commission ordered

---

[1] Most of the Employees are members of the Navajo Nation.

additional discovery on the relationship between the Nation and the Districts.

Before the Commission could hold an evidentiary hearing on the additional discovery, the Districts filed suit in federal district court seeking a declaration that "the [Commission] and the Navajo tribal courts lack jurisdiction over public school districts' employment decisions and practices conducted on the Navajo Reservation." The Districts also sought an injunction "to bar further prosecution of those claims in the tribal courts due to the lack of jurisdiction." The Commission, joined by the Employees, moved to dismiss for failure to exhaust tribal remedies. The Districts countered with a motion for summary judgment, asserting that tribal jurisdiction was so plainly lacking that the Districts did not need to exhaust tribal remedies. The Commission responded that summary judgment was unwarranted, particularly in the absence of fact-finding by the Commission. The Employees similarly argued that summary judgment was improper, and they also filed a Rule 56(f) motion to stay summary judgment proceedings to allow discovery.

The district court held that tribal jurisdiction was so plainly lacking that exhaustion in the tribal forum was not required. Accordingly, it denied the Commission and Employees' motion to dismiss and the Employees' motion to stay summary judgment proceedings. It also granted summary judgment to the Districts and enjoined further tribal proceedings. The Commission and Employees timely appealed.

## II.

"We review questions of tribal court jurisdiction and exhaustion of tribal court remedies de novo and factual

findings for clear error." *Grand Canyon Skywalk Dev., LLC v. 'Sa' Nyu Wa Inc.*, 715 F.3d 1196, 1200 (9th Cir. 2013), *cert. denied sub nom. Grand Canyon Skywalk Dev., LLC v. Grand Canyon Resort Corp.*, 134 S. Ct. 825 (2013). The merits of the Employees' complaints were not before the district court, nor are they before us—the only question presented here is whether tribal jurisdiction is so plainly lacking that the district court properly enjoined tribal proceedings.[2]

## III.

A tribal adjudicative body generally must have the first opportunity to evaluate its jurisdiction over a matter pending

---

[2] The dissent discusses the merits of the Employees' claims. But the Districts asked the district court to enjoin the tribal proceedings on the ground that "the Navajo tribal courts lack jurisdiction over public school districts' employment decisions and practices conducted on the Navajo Reservation, when the Districts are fulfilling their state responsibilities to provide education for all Arizona citizens," and the district court entered the requested injunction after agreeing as a matter of law with that broad legal principle, without discussing the merits of any particular employee's claim. Similarly, in defending the district court's judgment on appeal, the Districts argue that "[t]he facts material to the jurisdictional issue are (1) the status of the [school districts] as non-Indians—*i.e.*, Arizona political subdivisions who were haled into tribal court as defendants; and (2) the fact that the [school] districts' conduct at issue—employment decisions made in the scope of their constitutional obligation to provide a general and uniform public school system—is not connected to tribal lands." (citations omitted). Even if we were to consider the merits issues raised by the dissent and agreed that some of the employees' claims should likely fail, the dissent offers no reason to believe that Michael Coonis's claim lacks merit. So, even assuming a merits evaluation were relevant to the exhaustion question, there exists no merits-based justification for dismissing the entire consolidated action.

before it.  In *National Farmers Union Insurance Cos. v. Crow Tribe of Indians*, 471 U.S. 845 (1985), the Supreme Court explained the importance of this exhaustion requirement: "[Congress's] policy of supporting tribal self-government and self-determination . . . favors a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge." *Id.* at 856.  The Court reasoned that requiring exhaustion of jurisdictional questions in a tribal forum would not only appropriately respect "tribal self-government and self-determination," but would also serve "the orderly administration of justice in the federal court . . . by allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed." *Id.*  Moreover, "[e]xhaustion of tribal court remedies . . . will encourage tribal courts to explain to the parties the precise basis for accepting jurisdiction, and will also provide other courts with the benefit of their expertise in such matters in the event of further judicial review." *Id.* at 857.**[3]**

In light of the importance of exhaustion, federal courts will excuse the failure to exhaust in only four circumstances. *See Elliott v. White Mountain Apache Tribal Court*, 566 F.3d 842, 847 (9th Cir. 2009).  The Districts argue that one of these circumstances exists here: "when it is 'plain' that tribal court jurisdiction is lacking, so that the exhaustion requirement 'would serve no purpose other than delay.'" *Id.*

---

**[3]** The dissent criticizes us for not explaining why the policy purposes the Supreme Court set forth in *National Farmers* favor exhaustion in this case.  But those policy purposes reflect a respect for the sovereignty of tribes and are therefore not dependent on the particular facts of any case.  That is why we have held that exhaustion is always required *unless* certain limited circumstances are present.  *See Elliott v. White Mountain Apache Tribal Court*, 566 F.3d 842, 847 (9th Cir. 2009).

(quoting *Nevada v. Hicks*, 533 U.S. 353, 369 (2001)). We have explained that the "plainly lacking" exception to the exhaustion requirement does not apply when "jurisdiction is 'colorable' or 'plausible.'" *Id.* at 848 (quoting *Atwood v. Fort Peck Tribal Court Assiniboine*, 513 F.3d 943, 948 (9th Cir. 2008)). We must therefore decide whether tribal jurisdiction in this case is colorable or plausible.

## IV.

Our caselaw has long recognized two distinct frameworks for determining whether a tribe has jurisdiction over a case involving a non-tribal-member defendant: (1) the right to exclude, which generally applies to nonmember conduct on tribal land; and (2) the exceptions articulated in *Montana v. United States*, 450 U.S. 544 (1981), which generally apply to nonmember conduct on non-tribal land. The Commission and Employees argue that tribal jurisdiction is colorable in this case under either framework. The Districts respond that *Nevada v. Hicks*, 533 U.S. 353 (2001), eliminated the first framework such that jurisdiction over a nonmember exists only if a *Montana* exception applies, regardless of whether the relevant conduct occurred on tribal or non-tribal land.

We have repeatedly rejected the Districts' reading of *Hicks*, and today we reaffirm that the right-to-exclude framework continues to exist. Our court has read *Hicks* as creating only a narrow exception to the general rule that, absent contrary provisions in treaties or federal statutes, tribes retain adjudicative authority over nonmember conduct on tribal land—land over which the tribe has the right to exclude. We have held that *Hicks* applies "only when the specific concerns at issue in that case exist." *Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802, 813 (9th Cir. 2011). The specific concerns at issue in *Hicks*

related to enabling state officers to enforce state criminal laws for crimes that occurred off the reservation. 533 U.S. at 358 n.2. Because Arizona's interest in the enforcement of state criminal laws is not implicated here, we reject the Districts' argument that any state interest in this case plainly defeats jurisdiction under *Hicks*.[4] Contrary to the dissent's arguments, however, this is not to say that state interests beyond those in criminal law enforcement could never trigger application of *Hicks*. Rather, we hold only that because our caselaw leaves open the question of what state interests might be sufficient to preclude tribal jurisdiction over disputes arising on tribal land, tribal jurisdiction is plausible enough here that exhaustion is required.

## A.

To understand what *Hicks* did and did not do, it is important to situate that case in the context of other Supreme Court precedent.

## 1.

We begin with the general principle that a tribe's right to exclude non-tribal members from its land imparts regulatory and adjudicative jurisdiction over conduct on that land.

The Supreme Court has long recognized that Indian tribes have sovereign powers, including the power to exclude non-tribal members from tribal land. *See, e.g.*, *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333

---

[4] Because we hold that jurisdiction is colorable under the right-to-exclude framework, we need not reach Appellants' arguments about the second framework.

(1983). A tribe's regulatory authority derives from these sovereign powers. As the Supreme Court has explained:

> This power [to exclude] necessarily includes the lesser power to place conditions on entry, on continued presence, or on reservation conduct, such as a tax on business activities conducted on the reservation. When a tribe grants a non-Indian the right to be on Indian land, the tribe agrees not to exercise its ultimate power to oust the non-Indian as long as the non-Indian complies with the initial conditions of entry. However, it does not follow that the lawful property right to be on Indian land also immunizes the non-Indian from the tribe's exercise of its lesser-included power to tax or to place other conditions on the non-Indian's conduct or continued presence on the reservation.

*Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 144–45 (1982).

In *Strate v. A-1 Contractors*, 520 U.S. 438 (1997), the Supreme Court tied the scope of adjudicative jurisdiction to regulatory jurisdiction by holding that "[a]s to nonmembers, . . . a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction."[5] *Id.* at 453. This suggested that, because tribes generally maintain the power to exclude and

---

[5] Whether a tribe's adjudicative jurisdiction *equals* its legislative jurisdiction remains an open question. *See Hicks*, 533 U.S. at 358; *Philip Morris USA, Inc. v. King Mountain Tobacco Co.*, 569 F.3d 932, 940 (9th Cir. 2009) ("[I]t is unclear whether . . . tribal adjudicative jurisdiction extends to the boundary of tribal legislative jurisdiction.").

thus to regulate nonmembers on tribal land, tribes generally also retain adjudicative jurisdiction over nonmember conduct on tribal land.

The federal government may, however, limit a tribe's power either by treaty or by statute. *See Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 18 (1987). In interpreting the extent of any such limits, courts do not "lightly assume that Congress . . . intend[ed] to undermine Indian self-government." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2032 (2014). Thus, "[c]ivil jurisdiction over . . . activities [of non-Indians on tribal land] presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute." *Iowa Mut. Ins. Co.*, 480 U.S. at 18. On the other hand, criminal jurisdiction over non-Indians for offenses committed on tribal land does not presumptively lie in the tribal courts. *See Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 195, 206–08 (1978).**[6]** The Supreme Court has made clear that this distinction rests largely on the difference between Congress's traditional approach to tribal criminal jurisdiction, which Congress has historically limited, and its approach to tribal civil

---

**[6]** The decision in *Oliphant* that tribal courts lack criminal jurisdiction over non-Indians was based partly on the Supreme Court's conclusion that relevant legislation and treaties at the time required this outcome. 435 U.S. at 203–08. Since *Oliphant*, Congress has expanded tribal jurisdiction to criminal cases involving nonmember Indians' conduct on tribal land, *see United States v. Lara*, 541 U.S. 193, 196 (2004) (citing 25 U.S.C. § 1301(2)), and it has authorized tribal courts "to 'exercise special domestic violence criminal jurisdiction' over certain domestic violence offenses committed by a non-Indian against an Indian," *United States v. Bryant*, 136 S. Ct. 1954, 1960 n.4 (2016) (quoting 25 U.S.C. § 1304). Nevertheless, it remains true that "[t]ribal governments generally lack criminal jurisdiction over non-Indians who commit crimes in Indian country." *Id.* (citing *Oliphant*, 435 U.S. at 195).

jurisdiction, which it has not so limited. *See Nat'l Farmers*, 471 U.S. at 854–55.

Supreme Court precedent prior to *Hicks* thus indicated that tribes generally have civil but not criminal adjudicative jurisdiction over nonmember conduct on tribal land.

**2.**

By contrast, the Supreme Court has held that a tribe does not possess any inherent sovereign right to regulate nonmembers on non-tribal land, even if the land falls within the boundaries of a reservation. For nonmember conduct on non-tribal land, therefore, the Supreme Court has applied a different framework for analyzing the scope of tribal adjudicative authority.

In *Montana v. United States*, 450 U.S. 544 (1981), the Court held that the Crow Tribe did not have the sovereign right to regulate nonmember fishing and hunting on land that was within the boundaries of the Crow Reservation but was owned by nonmembers (commonly referred to as "non-Indian fee land" or "fee land"). *See id.* at 563–67. The Court then set forth two exceptions to this general rule. First, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id.* at 565. Second, "[a] tribe may . . . retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 566.

The Court analyzed both exceptions and found that neither was satisfied on the facts presented.  *See id.* at 566. Thus, the Tribe did not have the right to regulate nonmember fishing or hunting on fee land.  Instead, the Tribe could prohibit or regulate fishing or hunting by nonmembers only on tribal land within the reservation, "land on which the Tribe exercises 'absolute and undisturbed use and occupation.'"[7]  *Id.* at 559 (quoting Second Treaty of Fort Laramie, Crow Indians-U.S., May 7, 1868, 15 Stat. 649, 650).

As the Supreme Court has summarized, then, "tribes retain considerable control over *nonmember conduct on tribal land*."  *Strate*, 520 U.S. at 454 (emphasis added). "[W]ith respect to *non-Indian fee lands*," however, "[s]ubject to controlling provisions in treaties and statutes, and the two exceptions identified in *Montana*, the civil authority of Indian tribes and their courts . . . generally 'does not extend to the activities of *nonmembers* of the tribe.'"[8]

---

[7] We note one apparent inconsistency in the Supreme Court's caselaw.  Although *National Farmers* post-dated *Montana*, and although the conduct at issue in *National Farmers*—like that in *Montana*—took place on non-tribal land within the boundaries of a reservation, the Supreme Court in *National Farmers* did not analyze the question of jurisdiction pursuant to *Montana*.  Instead, the Court stated that "the existence and extent of a tribal court's jurisdiction will require a careful examination of tribal sovereignty, the extent to which that sovereignty has been altered, divested, or diminished, as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions," and that this "examination should be conducted in the first instance in the Tribal Court itself."  *Nat'l Farmers*, 471 U.S. at 855–56 (footnote omitted).

[8] The dissent suggests that *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316 (2008), demonstrates that the *Montana* exceptions should govern the jurisdictional question in this case.  But

*Id.* at 453 (alteration omitted) (emphasis added) (quoting *Montana*, 450 U.S. at 565).

**B.**

In *Hicks*, the Supreme Court modified this general framework to what our court has understood to be a limited extent.

The jurisdictional question in *Hicks* arose after state game wardens executed a search warrant on tribal land at the home of a tribal member suspected of committing a crime outside the reservation. *See Hicks*, 533 U.S. at 356. The suspect alleged that his property was damaged during the search and asserted civil rights claims against the state game wardens in tribal court. *See id.* at 356–57.

To resolve whether the tribal court had jurisdiction, the Supreme Court examined "the principle that Indians have the right to make their own laws and be governed by them[, which] requires 'an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other.'" *Id.* at 362 (quoting *Washington v. Confederated Tribes of Colville Reservation*, 447 U.S. 134, 156 (1980)). The Court explained that "tribal authority to regulate state officers in executing process related to the violation, off reservation, of state laws is not essential to tribal self-government or internal relations—to the right to make laws and be ruled by them." *Id.* at 364 (internal quotation marks omitted). The Court reasoned that, by contrast, "[t]he State's interest in execution of process is

---

*Plains Commerce Bank* involved "a non-Indian's sale of non-Indian fee land," *id.* at 330, and thus does not control this case, in which the conduct at issue occurred on tribal land.

considerable." *Id.* Accordingly, the Court concluded that the tribal court lacked jurisdiction, even though the events giving rise to the claim had transpired on tribal land. *See id.* at 374.

The Supreme Court recognized in *Hicks* that its earlier cases suggested that tribal jurisdiction over civil suits depended on land ownership, but the Court stated that "[t]he ownership status of land, . . . is only one factor to consider in determining whether regulation of the activities of nonmembers is 'necessary to protect tribal self-government or to control internal relations.'" *Id.* at 360 (quoting *Montana*, 450 U.S. at 564). The Court reaffirmed, however, that the ownership status of land is a "significant" factor, *id.* at 370, that "may sometimes be . . . dispositive," *id.*

Although the Court further suggested in *Hicks* that "the general rule of *Montana* applies to both Indian and non-Indian land," *id.* at 360, it also stated in a footnote: "Our holding in this case is limited to the question of tribal-court jurisdiction over state officers enforcing state law. We leave open the question of tribal-court jurisdiction over nonmember defendants in general." *Id.* at 358 n.2.

## C.

Although the Districts and the dissent would have us read *Hicks* to eliminate the right-to-exclude framework, our court has repeatedly rejected this interpretation. We have held that "*Hicks* is best understood as the narrow decision it explicitly claims to be," and we have emphasized that *Hicks*'s "application of *Montana* to a jurisdictional question arising on tribal land should apply only when the specific concerns at issue in [*Hicks*] exist." *Water Wheel*, 642 F.3d at 813. When other concerns have been present in civil cases involving nonmember conduct on tribal land, we have held

that tribal courts have jurisdiction unless a treaty or federal statute provides otherwise—regardless of whether the *Montana* exceptions would be satisfied.

In *McDonald v. Means*, 309 F.3d 530 (9th Cir. 2002), for example, we held that a tribal court had jurisdiction over a tort suit arising from an accident on a road within a reservation because it was a tribal road—even though neither *Montana* exception applied. *See id.* at 535–40, 536 n.2. We explained that *Hicks* did not preclude jurisdiction because its holding was limited to "the question of tribal-court jurisdiction over state officers enforcing state law." *Id.* at 540 (quoting *Hicks*, 533 U.S. at 358 n.2). In doing so, we explicitly rejected the argument that *Hicks* modified or overruled *Montana* such that it would "bar tribal jurisdiction not only over the conduct of nonmembers on non-Indian fee land but on tribal land as well." *Id.* at 540 n.9.

Similarly, in *Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802 (9th Cir. 2011), we reaffirmed that narrow interpretation of *Hicks*. We held that the Tribe's right to exclude implied tribal civil jurisdiction over an eviction proceeding that arose after a nonmember, private lessee of tribal land failed to pay rent. *Id.* at 805–06, 812–13. We explained that the *Montana* framework was inapplicable because the conduct at issue occurred on tribal land. *Id.* at 809–14. We also reiterated that *Hicks* is limited to situations in which "the specific concerns at issue in that case exist."[9] *Id.* at 813.

---

[9] Although our decision in *Philip Morris USA, Inc. v. King Mountain Tobacco Co.*, 569 F.3d 932 (9th Cir. 2009), could arguably be read to extend the *Montana* framework more broadly, we explained in *Water Wheel* that "*Philip Morris*'s comments regarding jurisdiction are best

We again adhered to our narrow reading of *Hicks* in *Grand Canyon Skywalk Development, LLC v. 'Sa' Nyu Wa Inc.*, 715 F.3d 1196 (9th Cir. 2013). We held that tribal jurisdiction was not plainly lacking over a property and contract dispute involving a company that was operating a tourist attraction on tribal land. *See id.* at 1199, 1205. We held instead that the right-to-exclude framework applied because the dispute arose on tribal land, and we characterized *Montana* as "consider[ing] tribal jurisdiction over nonmember activities on *non-Indian* land, *held in fee simple*, within a reservation." *Id.* at 1205. Given the lack of any "obvious state interests at play" we concluded that, "[a]t the very least, it [could] not be said that the tribal court plainly lack[ed] jurisdiction" under *Hicks*.[10]    *Id.*    We

_____

understood as a reiteration of the Supreme Court's rule that a tribe's adjudicative jurisdiction may not exceed its regulatory jurisdiction." 642 F.3d at 815. "Furthermore," we continued, "*Philip Morris* did not involve a question related to the tribe's authority to exclude or its interest in managing its own land. To the contrary, the activity in question occurred off reservation." *Id.* Similarly, although *Smith v. Salish Kootenai College*, 434 F.3d 1127 (9th Cir. 2006) (en banc), could arguably be read to extend the *Montana* framework, the jurisdictional question in *Smith* arose in a different context from the one presented here. In *Smith*, a nonmember challenged a tribal court's authority to adjudicate a claim that he had filed as a plaintiff in tribal court. *Id.* at 1128, 1133. We held that by filing the claim, the nonmember had consented to tribal jurisdiction. *Id.* at 1136. By contrast, nonmember defendants—not plaintiffs—challenge the tribal forum's jurisdiction in this case.

[10] The dissent here describes *Water Wheel* and *Grand Canyon* as "acknowledg[ing] that *Hicks* requires application of the *Montana* framework when there are 'competing state interests at play.'" In fact, in both cases we identified the lack of competing state interests as a reason why the *Montana* framework did not apply, *Grand Canyon*, 715 F.3d at 1205; *Water Wheel*, 642 F.3d at 805, but we did not say that the presence of competing state interests—whatever their nature—would

therefore held that exhaustion of tribal remedies was required. *See id.* at 1200–01.

Our precedent thus makes clear that the right-to-exclude framework survives the narrow carve out effected by *Hicks*.[11]

---

automatically cause *Montana* to apply. Indeed, in *Grand Canyon,* we stated that "when a competing state interest exists courts balance that interest against the tribe's" to determine whether there is tribal jurisdiction. 715 F.3d at 1205. Here, the tribal tribunal had ordered discovery on the nature of the tribal and state interests at stake, but the district court enjoined the tribal proceedings before that discovery or any hearing about it could occur. We thus do not know the full contours of the tribal and state interests at stake, including whether or how, as the dissent contends, Arizona's "interest in complying with a statutory and constitutional directive to provide a uniform system of public education to all the State's children" is implicated by the individual employment disputes in this case. Indeed, the parties dispute whether the Districts are traditional school districts controlled by state or local government, or whether they are "special-purpose governments with a separately elected governing body" that are "legally separate, and fiscally independent of other state and local governments," and thus dispute how directly the State's policies are involved. Nor do we know how the tribal tribunal would have balanced the interests at stake here if exhaustion had run its course.

[11] The dissent apparently disagrees with our precedents in this area. But we as a three-judge panel are bound by those precedents absent an intervening irreconcilable Supreme Court decision. *See Miller v. Gammie*, 335 F.3d 889, 892–93 (9th Cir. 2003) (en banc). The dissent points to no such Supreme Court decision. Indeed, every Supreme Court case that the dissent discusses was decided before *Water Wheel* and *Grand Canyon* and thus cannot be described as an *intervening* decision. The dissent refers without citation to "all existing authority" that establishes that when "there are competing state interests at stake, tribal jurisdiction over nonmembers only exists if at least one of the two *Montana* exceptions is satisfied." We are unaware of any such authority from our court or the Supreme Court.

## V.

Tribal jurisdiction is plausible in this case because (a) the schools operated by the Districts are located on tribal land over which the Navajo Nation maintains the right to exclude, and (b) state criminal law enforcement interests are not present here. We need not decide whether *Hicks* could be expanded to cover state interests other than those in criminal law enforcement because the only issue here is whether jurisdiction is colorable or plausible under our current precedent.

## A.

The 1868 treaty that established the Navajo Reservation makes clear that the Navajo Nation has the right to exclude nonmembers from the land on which the Districts' schools are now located. Article II of the treaty defines the reservation's boundaries and contains an "exclusion" clause:

> [T]he United States agrees that no persons except those herein so authorized to do, and except such officers, soldiers, agents, and employe[e]s of the government, or of the Indians, as may be authorized to enter upon Indian reservations in discharge of duties imposed by law, or the orders of the President, shall ever be permitted to pass over, settle upon, or reside in, the territory described in this article.

Treaty between the United States of America and the Navajo Tribe of Indians, Navajo Tribe of Indians-U.S., art. II, June 1, 1868, 15 Stat. 667. In Article VI of the treaty, the Navajo tribe agreed "to compel their children . . . to attend school," and the United States committed to providing teachers who

would "reside among" the tribe. Although this provision suggests that the Navajo Nation may have waived its right to exclude *federal* teachers and schools, it says nothing about the Navajo Nation's authority to exclude *state* officials.**[12]**

Indeed, interpreting that treaty in a case involving Arizona's right to tax Navajo tribe members on tribal land, the Supreme Court held that "it cannot be doubted that the reservation of certain lands for the . . . Navajos and the exclusion of non-Navajos from . . . [those lands] was meant to establish the lands as within the exclusive sovereignty of the Navajos." *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 174–75 (1973). Absent explicit congressional action to modify or eliminate tribal rights granted by a treaty, those rights remain. *See South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 343 (1998) ("Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights. Accordingly, only Congress can alter the terms of an Indian treaty by diminishing a reservation, and its intent to do so must be 'clear and plain.'" (citations omitted) (quoting *United States v. Dion*, 476 U.S. 734, 738–39 (1986))).

Thus, as the treaty makes clear, the land at issue here is "within the exclusive sovereignty of the Navajos," and from this sovereignty, regulatory and adjudicative authority follow. *See Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130,

---

**[12]** The dissent states that Arizona "became subject to the Treaty's specific requirement of government schools on Indian land" without citing any authority for that proposition. As discussed *infra*, the Enabling Act required Arizona to establish a system of public education, but it said nothing about Arizona taking over the federal government's treaty relationship with the Navajo, as the dissent seems to suggest.

144–45 (1982); *Strate v. A-1 Contractors*, 520 U.S. 438, 453 (1997).

The Districts argue, however, that the treaty is not broad enough to support jurisdiction over state school districts. Instead, according to the Districts, the treaty protects only the Navajo Nation's authority over tribal lands and internal affairs.   But it is at least plausible that the Tribe has adjudicative jurisdiction here because the conduct occurred on tribal land, where the Navajo Nation has the right to exclude.  *See McClanahan*, 411 U.S. at 174 ("[T]his Court in interpreting Indian treaties, [has] adopt[ed] the general rule that '[d]oubtful expressions are to be resolved in favor of [the Tribe].'" (third alteration in original) (quoting *Carpenter v. Shaw*, 280 U.S. 363, 367 (1930))).

The Districts next argue that whatever rights the treaty originally preserved for the Navajo Nation, Congress eliminated the Nation's right to exclude, and thus its regulatory and adjudicative authority, by enacting the New Mexico-Arizona Enabling Act (the "Enabling Act"), ch. 310, 36 Stat. 557 (1910).   The Enabling Act authorized the creation of the State of Arizona, and it required, as a condition of admission to the United States, the adoption of a constitution requiring the establishment and maintenance of a public school system.  *Id.* at 570.  It also specifically mandated that "the schools, colleges, and universities provided for in this Act shall forever remain under the exclusive control of the said State."  *Id.* at 573–74.  The Districts argue that, under this congressional enactment, even schools located on tribal land must remain under the exclusive control of the State, including for purposes of adjudicative jurisdiction.  But "courts will not lightly assume that Congress in fact intends to undermine Indian self-government."  *Michigan v. Bay Mills Indian Cmty.*, 134 S.

Ct. 2024, 2032 (2014).  And nothing in the Enabling Act specifically addresses state schools on tribal land.  In fact, the Enabling Act required Arizona, as a condition of admission, to disclaim any right to tribal land within its boundaries.  *See* 36 Stat. at 569.  Thus there are at least colorable arguments on both sides of the question whether the Enabling Act eliminated the Nation's right to exclude. The Districts' argument is therefore not strong enough to render tribal jurisdiction implausible.[13]

The Districts further argue that Congress abrogated the treaty when it authorized, with the Navajo Nation's consent, enforcement of state compulsory school attendance laws. But this argument likewise fails to demonstrate that tribal jurisdiction is clearly lacking.  It is true that Congress authorized state officials to enter tribal land for the limited purpose of enforcing compulsory school attendance laws, and that the Navajo Nation consented to the enforcement on tribal land of such laws.  *See* Act of Feb. 15, 1929, ch. 216, 45 Stat. 1185; Act of Aug. 9, 1946, ch. 930, 60 Stat. 962 (amending the Act of Feb. 15, 1929); 10 Navajo Nation Code § 503.  But, beyond officers enforcing truancy laws, such authorization and consent do not abrogate the right to exclude state public schools and their employees more generally—or the regulatory and adjudicative jurisdiction attendant to that right.  Indeed, the fact that the Districts had to sign leases with the Navajo Nation to operate schools on

---

[13] To the extent that the Districts argue that Arizona is under a federal mandate to provide a free public education to Navajo children, any such mandate does not necessarily require that schools be located on tribal land as opposed to, for example, land located within the boundaries of the reservation but owned by the State or nonmembers.

Navajo land suggests that the Navajo Nation maintains the right to exclude state schools.

Furthermore, the leases themselves cannot be understood as a surrender of tribal jurisdiction. "[U]nless expressly waived 'in unmistakable terms' within [a] contract, a tribe retains its inherent sovereignty, and as such, the tribe may have jurisdiction." *Grand Canyon Skywalk Dev., LLC v. 'Sa' Nyu Wa Inc.*, 715 F.3d 1196, 1205 (9th Cir. 2013) (quoting *Merrion*, 455 U.S. at 148). Neither lease "expressly waive[s] in unmistakable terms" tribal jurisdiction. Window Rock's lease requires the school district to abide by Navajo laws, to the extent that they do not conflict with Arizona or federal law, and it further provides that the agreement to abide by Navajo laws does not forfeit any rights under state or federal laws. Pinon's lease does not mention Navajo law or jurisdiction. At most, the Window Rock and Pinon leases are ambiguous as to their effect on tribal jurisdiction, which leads us to conclude that tribal jurisdiction is not plainly lacking.[14]

## B.

The Districts argue in the alternative that Arizona's interest in this case is important enough that *Hicks* applies to deprive the tribal courts of jurisdiction. But as discussed above, our court has taken *Hicks* at its word that its "holding

---

[14] Although the employment contracts of two employees state that jurisdiction for matters arising out of the contract lie with Arizona state courts and federal courts, most of the contracts provided only that the employees agreed to abide by state and federal law and were silent as to the laws that would govern the contractual relationship and as to where disputes about the employment relationship would be litigated. Most of the contracts, including Michael Coonis's, *see* n.2 *supra*, lack any provisions that even arguably bear on the tribal jurisdiction question.

. . . is limited to the question of tribal-court jurisdiction over state officers enforcing state law." *Nevada v. Hicks*, 533 U.S. 353, 358 n.2 (2001). Because "the specific concerns at issue in that case," *Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802, 813 (9th Cir. 2011), are not present here, it is at least plausible that tribal jurisdiction exists. Exhaustion is therefore required.

Our conclusion is bolstered by *National Farmers Union Insurance Cos. v. Crow Tribe of Indians*, 471 U.S. 845 (1985). There, a tribal member student was injured at a school on state land within the boundaries of an Indian reservation. *Id.* at 847. The Supreme Court required tribal court exhaustion in the resulting tort suit. *See id.* at 847, 856–57. This case arguably presents even stronger reasons to require tribal court exhaustion, because, unlike the school in *National Farmers*, the schools operated by the Districts are located on tribal land, not state-owned land.

In sum, because the conduct at issue here occurred on tribal land over which the Navajo Nation has the right to exclude nonmembers, and because state criminal law enforcement interests are not present, we hold that tribal jurisdiction is at least colorable or plausible and that exhaustion in the tribal forum is therefore required.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the grant of summary judgment and **REMAND** to the district court with instructions to **DISSOLVE** the injunction and **DISMISS** the case for failure to exhaust.

CHRISTEN, Circuit Judge, dissenting:

The opinion issued today creates a circuit split and is notable for what it leaves out. First, the majority does not explain that, before they filed claims in tribal court, five out of the seven employee claimants had already received adverse state-court rulings on their claims against the school districts. The majority also overlooks that two of the employee claimants had employment contracts specifying that jurisdiction for any employment disputes would exclusively lie in state or federal court. The majority nominally recognizes the pathmarking case on tribal jurisdiction over nonmembers, *Montana v. United States*, 450 U.S. 544 (1981), only to flip its seminal holding. *Montana*, and the Supreme Court authority that followed it, make clear that the inherent sovereign powers of Indian tribes generally do not extend to the activities of nonmembers. *See Nevada v. Hicks*, 533 U.S. 353, 358–59 (2001).

The majority takes refuge primarily in two entirely distinguishable cases from our circuit, *Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802 (9th Cir. 2011) (per curiam), and *Grand Canyon Skywalk Development, LLC v. 'Sa' Nyu Wa Inc.*, 715 F.3d 1196 (9th Cir. 2013), which purport to limit *Montana*'s framework to cases where there are competing state interests. *Water Wheel* and *Grand Canyon* are already recognized as outliers, but the majority goes much farther, striking out on its own and holding that unless a state is seeking to enforce its criminal laws, *Montana* does not apply to nonmember conduct on tribal land even in the presence of clear competing state interests.

Finally, in my view, the majority gives short shrift to the school districts' obligation to operate public schools within

the Navajo Reservation's boundaries, treating Window Rock and Pinon Unified School Districts as private parties engaged in consensual, private-sector contractual relationships on the Navajo Reservation. In fact, the districts are non-tribal-member political subdivisions of the State of Arizona with statutory and state constitutionally imposed mandates to provide a uniform public school system to all Arizona's children. For these reasons, tribal jurisdiction over these consolidated disputes is neither colorable nor plausible, and I must respectfully dissent.

## BACKGROUND

This appeal addresses seven cases consolidated by the Navajo tribal court, the Navajo Nation Labor Commission.[1] The claimants are not similarly situated. The first four, Loretta Brutz, Mae John, and Ann and Kevin Reeves, are employees of Window Rock Unified School District. Respectively, they work as a speech therapist and pathologist, a speech language pathologist, a school psychologist, and a physical therapist. None of them are certified teachers. Brutz and John are members of the Navajo Nation; Ann and Kevin Reeves are not. These four claimants (the Brutz claimants) filed a complaint in state superior court challenging Window Rock's determination that they are not entitled to the merit pay that Arizona's public school teachers receive pursuant to Arizona's Proposition 301. *See* Ariz. Rev. Stat. § 15-977(A), (B). The state superior court agreed with the school district that non-teachers are not entitled to Proposition 301 merit pay, and

---

[1] The tribal court consolidated the separately filed complaints of Loretta Brutz, Mae John, and Ann and Kevin Reeves in 2009. The tribal court later consolidated these complaints with those of Michael Coonis, Clarissa Hale, and Barbara Beall.

the Arizona Court of Appeals affirmed that decision. *See Reeves v. Barlow*, 251 P.3d 417 (Ariz. Ct. App. 2011). Rather than seek review in the Arizona Supreme Court, the Brutz claimants pressed their argument for teacher merit pay by filing new complaints, this time in tribal court.

The next two claimants, Michael Coonis and Clarissa Hale, are members of the Navajo Nation and former employees of Window Rock. Coonis and Hale allege that Window Rock violated the Navajo Preference in Employment Act (NPEA).[2] They contend that Window Rock failed to promote them to positions for which they were the most qualified Navajos. After filing employment charges with the Office of Navajo Labor Relations (ONLR), Coonis and Hale filed complaints with the tribal court.

The final claimant, Barbara Beall, is a member of the Navajo Nation and a former employee of Pinon Unified School District. Pinon terminated Beall for unprofessional conduct and continual and repeated failure to comply with school-district policies. Beall appealed her termination to a state administrative hearing officer, and lost. Instead of filing an appeal in superior court, Beall filed an employment charge with the ONLR and a complaint in tribal court. Both allege that Pinon violated the NPEA by firing Beall without just cause.

All seven claimants signed employment contracts with the school districts agreeing to abide by applicable laws of the United States and the State of Arizona, as well as the

---

[2] The NPEA requires employers to give preference in employment to Navajos and dictates that employers may not fire Navajo employees without just cause. *See* 15 Navajo Nation Code §§ 601, *et seq.*

State Board of Education's policies, rules, and regulations. Hale's and Beall's contracts further specified that "Arizona State and federal courts shall exercise exclusive jurisdiction over any and all matters arising out of this contract."**[3]**

In tribal court, Window Rock and Pinon filed motions to dismiss these claims for lack of tribal-court jurisdiction, giving the tribal court first crack at resolving this jurisdictional dispute. Without ruling on the motion to dismiss, the tribal court consolidated the employees' claims, and ordered an evidentiary hearing for the school districts to present detailed evidence concerning the history of government-to-government compacts between the Navajo Nation and the State of Arizona and the ethnic composition of the districts. Only then did the school districts file this action in federal court seeking to enjoin the tribal-court proceedings and arguing that exhaustion was not required because the tribal court plainly lacked jurisdiction. The school districts named as defendants the seven claimants identified above, and members of the tribal court assigned to the consolidated case.

In federal court, the defendants filed a motion to dismiss, and the school districts filed a motion for summary judgment. The district court granted Window Rock and Pinon's motion for summary judgment. In doing so, the court began with the touchstone authority concerning tribal-

---

**[3]** By providing this background, I do not suggest that the merits of the claimants' disputes with the school districts are before us. The nature of the claims, not the merits of the claims, gives context to the jurisdictional question we must decide. It also shows that: (1) several of the claimants are actually challenging the jurisdiction of the state courts that already rendered verdicts on the same claims they raise here; and (2) unlike many cases involving challenges to tribal jurisdiction, comity concerns in this case weigh heavily against exhaustion.

court jurisdiction over non-tribal members, *Montana v. United States*, 450 U.S. 544 (1981).  The court recognized that *Montana*'s general rule governed these claims due to "the state's considerable interest, arising from outside of the reservation, in providing for a general and uniform public education."    The court considered *Montana*'s two exceptions, but decided that neither of them established tribal jurisdiction over these employment-related disputes between the school districts and their present and former employees, and that further factual development was not necessary because tribal jurisdiction was plainly lacking. The panel majority reverses, deciding that tribal-court jurisdiction is plausible and exhaustion is thus required.**[4]**  I would affirm the district court's ruling in all respects.

## DISCUSSION

### I.  Although Indian Tribes Retain Inherent Sovereign Powers, They Do Not Possess the Full Attributes of Sovereignty.

"Indian tribes are 'unique aggregations possessing attributes of sovereignty over both their members and their territory.'"  *Montana*, 450 U.S. at 563 (quoting *United States v. Wheeler*, 435 U.S. 313, 323 (1978), *superseded by statute on other grounds as recognized in United States v. Lara*, 541 U.S. 193, 199–207 (2004)).    They possess inherent

---

**[4]** The majority describes several reasons behind the policy favoring exhaustion, *see Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 856–57 (1985), but does not explain why the policy weighs in favor of exhaustion in this case.  *Strate v. A–1 Contractors*, 520 U.S. 438, 450 (1997), makes clear that the exhaustion preference is based on prudential considerations and is not required if tribal jurisdiction is plainly lacking.  *See id*. at 450–51.  This inquiry is highly case specific.

"powers of self-government." 25 U.S.C. § 1301. "Thus, in addition to the power to punish tribal offenders, the Indian tribes retain their inherent power to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members." *Montana*, 450 U.S. at 564. Tribes "may also exclude outsiders from entering tribal land," *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 328 (2008), and "place conditions on entry, on continued presence, or on reservation conduct, such as a tax on business activities conducted on the reservation," *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 144 (1982). Tribes retain these inherent sovereign powers in the absence of contrary treaties or federal statutes. *See Nevada v. Hicks*, 533 U.S. 353, 365 (2001).

But "Indian tribes are . . . no longer 'possessed of the full attributes of sovereignty.'" *Wheeler*, 435 U.S. at 323 (quoting *United States v. Kagama*, 118 U.S. 375, 381 (1886)). "Their incorporation within the territory of the United States, and their acceptance of its protection, necessarily divested them of some aspects of the sovereignty which they had previously exercised." *Id.* "[E]xercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations . . . cannot survive without express congressional delegation." *Montana*, 450 U.S. at 564.

## II. Tribal Jurisdiction Generally Does Not Extend to Non-Tribal Members.

The panel majority concludes that absent contrary treaties or federal statutes, Indian tribes' inherent sovereign right to exclude generally affords tribal-court jurisdiction over nonmember conduct on tribal land. Not so. Supreme Court precedent and our own case law makes clear that at

least where there are competing state interests, tribes generally *lack* jurisdiction over the conduct of non-tribal members within the boundaries of a reservation, regardless of the status of the land on which nonmember conduct occurs.

In *Montana v. United States*, the Supreme Court addressed whether the Crow Tribal Council had jurisdiction to regulate non-Indian hunting and fishing on non-Indian land located within the Crow Reservation.[5]  450 U.S. at 547. Finding no treaties or statutes that conferred tribal authority to regulate such conduct on non-Indian land within the reservation, the Supreme Court discussed whether such regulatory authority existed by virtue of the Crow Tribe's inherent sovereign authority.  *Id.* at 557–66.  The Supreme Court stated that as a "general proposition[,] . . . the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe."  *Id.* at 565.  "[T]he Indian tribes have lost any 'right of governing every person within their limits except themselves.'"   *Id.* (quoting *Fletcher v. Peck*, 10 U.S. 87, 147 (1810)).

The *Montana* Court nonetheless articulated two exceptions to the general rule of no tribal jurisdiction over nonmembers: (1) "[a] tribe may regulate, through taxation,

---

[5] The State of Montana owned this land in fee simple.  *See Montana*, 450 U.S. at 547–48, 556.  Reservation land generally falls into three categories: (1) unallotted lands held in trust by the United States for the Tribe; (2) allotted land held in trust by the United States for individual Indians; and (3) fee lands now owned by non-Indians.  *See id.* at 458; *see also Big Horn Cty. Elec. Co-op., Inc. v. Adams*, 219 F.3d 944, 948 (9th Cir. 2000) ("There is a checkerboard pattern of land ownership on the Reservation composed of fee land owned by non-Indians and members of the Tribe and trust land held by the United States in trust for the Tribe.").

licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements"; and (2) "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribes." *Id.* at 565–66. The Supreme Court then held that regulating non-Indian hunting and fishing on non-Indian land did not fall into either exception and, as such, was not within the Crow Tribe's jurisdiction. *Id.* at 566.

*Montana* was directed at tribal regulatory authority, but in *Strate v. A–1 Contractors*, the Supreme Court extended *Montana*'s rule to tribal adjudicative authority. 520 U.S. 438, 442 (1997). *Strate* arose when two non-Indians were involved in a car accident on a highway that crossed the Fort Berthold Indian Reservation in North Dakota. *Id.* at 442–43. The state operated the highway pursuant to a federally granted right of way, but the tribal court determined it had jurisdiction to hear a suit for damages between the drivers, one driver's employer, and the employer's insurer. *Id.* at 443–44. The tribal-court defendants sued in federal court to enjoin the tribal-court proceedings, *id.* at 444, eventually leading to the Supreme Court's first statement that while *Montana* applies to questions of tribal adjudicative jurisdiction, "[a]s to nonmembers, . . . a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction," *id.* at 453. Applying this holding to the accident in *Strate*, the Court held that neither *Montana* exception afforded tribal-court jurisdiction over "run-of-the-mill" car-accident suits occurring on state-operated highways. *Id.* at 456–59.

In these decisions, the Supreme Court broadly stated the general rule of no tribal jurisdiction over nonmembers, but the Court only had occasion to apply the rule to conduct on land owned or controlled by non-Indians. That changed in *Nevada v. Hicks*, where the Supreme Court addressed tribal-court jurisdiction over a claim for damages arising from a state game warden's service of process on tribal land. 533 U.S. 353, 356–57 (2001). In *Hicks*, Nevada state game wardens allegedly damaged property of tribal member Floyd Hicks and exceeded the bounds of a search warrant while searching Hicks' home for evidence that he unlawfully killed a bighorn sheep off the reservation. *Id.* The Supreme Court held that the tribal court did not have jurisdiction over Hicks' civil claims against the state game wardens. *Id.* at 364–69.

The *Hicks* Court further held that the State of Nevada was not required to exhaust tribal remedies before bringing its jurisdictional challenge in federal court because the tribal court plainly lacked jurisdiction. *Id.* at 369. The decision expressly extended *Montana*'s general rule of no tribal jurisdiction to non-Indian conduct on Indian land. *Id*. at 360 (stating that "the general rule of *Montana* applies to both Indian and non-Indian land" and "[t]he ownership status of the land . . . is only one factor to consider"). The Court was clear that its ruling did not contravene "the principle that Indians have the right to make their own laws and be governed by them," but equally clear that this right must be balanced against the State's "interests outside the reservation." *Id.* at 362.

The Supreme Court reaffirmed the *Hicks* holdings in *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316 (2008). *Plains Commerce Bank* involved allegations that a non-Indian bank sold fee land that it owned on a reservation to non-Indians under terms that were more

favorable than terms the bank offered to an Indian couple. *See id.* at 320–24.  The couple sued the bank for discrimination in tribal court, and they were awarded a $750,000 general verdict.  *Id.* at 323.  The bank sought a declaratory judgment in federal district court that the tribal judgment was null and void due to lack of jurisdiction over the couple's discrimination claim.  *Id.*  Applying *Montana*, the Supreme Court agreed with the bank.  *Id.* at 324.

The Court began its analysis with the principle that "tribes do not, as a general matter, possess authority over non-Indians who come within their borders." *Id.* at 328.  The Supreme Court reiterated that although this principle applies with particular strength to "non-Indian fee land," the ownership of the land is just one factor, and tribal authority over nonmember conduct on *all* land within a reservation is restricted.  *See id.* at 327–28.  *Plains Commerce Bank* recognized the continuing validity of the two *Montana* exceptions, but held that neither exception conferred jurisdiction on the tribal court under the facts of that case. *Id.* at 329–30, 340–41.**[6]**

---

**[6]** The panel majority relies heavily on the fact that the school districts are located on tribal land, whereas the conduct in *Plains Commerce Bank* occurred on non-Indian fee land.  Boiled down, the majority announces a rule that tribal jurisdiction is plausible any time nonmember conduct occurs on tribal land unless state criminal law enforcement interests are implicated.  ("But it is at least plausible that the Tribe has adjudicative jurisdiction here because the conduct occurred on tribal land, where the Navajo Nation has the right to exclude.").  In doing so, the majority overlooks the general directives in *Plains Commerce Bank*.  "[T]he inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe."  554 U.S. at 328 (alteration in original) (quoting *Montana*, 450 U.S. at 565).  "This *general rule* restricts tribal authority over nonmember activities taking place on the reservation, and is particularly strong when the

Our court has recognized that, apart from the two *Montana* exceptions, "the tribes' inherent sovereignty does not give them jurisdiction to regulate the activities of nonmembers." *See Philip Morris USA, Inc. v. King Mountain Tobacco Co.*, 569 F.3d 932, 938–39 (9th Cir. 2009) ("As a general rule, tribes do not have jurisdiction, either legislative or adjudicative, over nonmembers, and tribal courts are not courts of general jurisdiction."). But in two recent cases, our circuit case law purports to limit *Montana*'s expansive general rule: *Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802 (9th Cir. 2011) (per curiam), and *Grand Canyon Skywalk Development, LLC v. 'Sa' Nyu Wa Inc.*, 715 F.3d 1196 (9th Cir. 2013).

In *Water Wheel*, our court considered a dispute arising from the lease of a resort located on land held in trust by the United States for the Colorado River Indian Tribes. 642 F.3d at 805. After leasing the land for twenty-five years, the resort stopped making the required lease payments to the Tribes but continued to operate essentially rent-free for another seven years. *Id.* The resort operators refused to vacate the land even after the lease expired, so the Tribes sued to evict the resort operator, collect unpaid rent, and recover damages for their lost use of the property. *Id.*

It was in this context that our court stated, "[*Hicks*'s] application of *Montana* to a jurisdictional question arising on tribal land should apply only when the specific concerns at issue in that case exist. Because none of those circumstances exist here, we must follow precedent that

---

nonmember's activity occurs on land owned in fee simple by non-Indians . . . ." *Id.* (emphasis added).

limits *Montana* to cases arising on non-Indian land." *Id.* at
813. *Water Wheel* went on:

> In this instance, where the non-Indian activity
> in question occurred on tribal land, the
> activity interfered directly with the [T]ribe's
> inherent powers to exclude and manage its
> own lands, and there are no competing state
> interests at play, the [T]ribe's status as
> landowner is enough to support regulatory
> jurisdiction without considering *Montana*.

*Id.* at 814 (emphasis added). *Water Wheel* did not precisely
identify what it meant by the "specific concerns" at issue in
*Hicks* that warranted application of *Montana*'s general rule
to jurisdictional questions arising on tribal land, but it did
expressly recognize that "competing state interests" would
change the analysis. There were no competing state interests
in *Water Wheel*, and the court concluded that the Tribes had
both regulatory and adjudicative jurisdiction over the resort
operator's conduct. *See id.* at 816.

Notably, *Water Wheel* also concluded that *Montana*'s
two exceptions would allow for jurisdiction over the Tribes'
dispute with the resort operator. *Id.* at 816–19. In particular,
the second *Montana* exception established tribal jurisdiction
over the Tribes' trespass claim because the resort operator's
"unlawful occupancy and use of tribal land not only deprived
[the Tribes'] of [their] power to govern and regulate [their]
own land, but also of [their] right to manage and control an
asset capable of producing significant income." *Id.* at 819.
In keeping with *Hicks'* admonition that land ownership
status "may sometimes be a dispositive factor," *see Hicks*,
533 U.S. at 360, *Water Wheel* concluded that the Tribes'
assertion of jurisdiction was proper in light of their

significant interest in securing occupancy and control of tribal land and the absence of competing state interests, 642 F.3d at 819.

In *Grand Canyon*, our court considered a situation similar to *Water Wheel*. *Grand Canyon* involved the glass-bottomed "Skywalk," a viewing platform overlooking the Grand Canyon built on land held in trust for the Hualapai Tribe. 715 F.3d at 1198–99. A non-tribal developer, Grand Canyon Skywalk Development, entered into a revenue sharing agreement with a tribal corporation in order to build and operate the Skywalk, and the Tribe later passed a resolution to exercise eminent domain over the developer's contractual interests. *Id.* at 1199.

Alleging that the Tribe had no authority to condemn its private contract rights, the developer filed a motion for a temporary restraining order in district court seeking to enjoin the eminent domain action. *Id.* *Grand Canyon* held that the developer was required to exhaust its remedies in tribal court. *See id.* at 1203–04. In so ruling, the court looked to *Water Wheel* and noted that, as in *Water Wheel*, *Grand Canyon* involved a non-tribal-member who entered into a consensual agreement "to develop and manage a tourist location on tribal land in exchange for a fee" and "it was access to the valuable tribal land that was the essential basis for the agreement." *Id.* at 1204. *Grand Canyon* reasoned, "as the dispute centers on Hualapai trust land *and there are no obvious state interests at play*, the *Hicks* exception is unlikely to require *Montana*'s application. At the very least, it cannot be said that the tribal court plainly lacks jurisdiction." *Id.* at 1205 (emphasis added). Like *Water Wheel*, *Grand Canyon* concluded that the *Montana* exceptions, if applied, would also provide for tribal jurisdiction. *Id.* at 1205–06.

The results in *Water Wheel* and *Grand Canyon* were a function of the Tribes' significant interests in managing exceptionally valuable tribal land and the lack of any competing state interests. *See, e.g.*, *Water Wheel*, 642 F.3d at 814 (emphasizing that "the activity interfered directly with the [T]ribe's inherent powers to exclude and manage its own lands, and there are no competing state interests at play"). Nevertheless, our court's narrow interpretation of *Hicks* and *Montana* has been criticized. The dissent in *Dolgencorp, Inc. v. Mississippi Band of Choctaw Indians* observed, "Both the Choctaw Supreme Court and the district court *a quo* have ruled, in light of dicta in *Hicks* and *Plains Commerce Bank*, that the Ninth Circuit's narrow application of *Montana* is incorrect, a ruling that the tribal defendants do not challenge." 746 F.3d 167, 180 n.8 (5th Cir. 2014) (Smith, J., dissenting), *aff'd by an equally divided court sub nom. Dollar Gen. Corp. v. Miss. Band of Choctaw Indians*, 136 S. Ct. 2159 (2016) .[7] And in *Stifel, Nicolaus & Co. v. Lac du Flambeau Band of Lake Superior Chippewa Indians*, the Seventh Circuit expressed its view that *Water Wheel*'s reasoning cannot be reconciled "with the language that the Court employed in *Hicks* and *Plains Commerce Bank*." 807 F.3d 184, 207 n.60 (7th Cir. 2015). But even assuming *Water Wheel* and *Grand Canyon* correctly interpreted *Hicks* to mean that *Montana* need not be applied in every case involving tribal land, all existing authority points to the rule that when there are no contrary treaties or statutes and there

---

[7] The majority in *Dolgencorp* applied *Montana* and held that the Tribe had jurisdiction over a nonmember based on the first *Montana* exception. *See* 746 F.3d at 169. The dissent agreed that *Montana* applied, but disagreed with the majority's conclusion that the tribe had met the requirements of the first exception. *See id.* at 177–80 (Smith, J., dissenting).

*are* competing state interests at stake, tribal jurisdiction over nonmembers only exists if at least one of the two *Montana* exceptions is satisfied.[8]

## III. The Tribe Does Not Have the Right to Exclude Nonmember School Districts from the Reservation.

The panel majority further errs by concluding that the Treaty of 1868 secured the Navajo Nation's unqualified right to exclude the school districts, and by disregarding the compelling state interests at play here. The Treaty of 1868 carved out and reserved specific rights for the Navajo Nation. By virtue of its inherent tribal sovereignty, the Navajo Nation also retained other rights necessary to self-government and control of internal relations, *see Strate v. A–1 Contractors*, 520 U.S. 438, 445–46 (1997) (discussing what powers the tribes retain), but the right to exclude nonmember school districts from the Navajo Reservation is not among them.[9]

---

[8] The panel majority states that neither *Water Wheel* nor *Grand Canyon* decided that *Montana* applies where there are competing state interests, only that *Montana* does *not* apply where there are no competing state interests. But both decisions skirt *Montana* and *Hicks* based on the lack of competing state interests and both acknowledge that *Montana* would otherwise be the rule. *See Water Wheel*, 642 F.3d at 804–05; *see also Grand Canyon*, 715 F.3d at 1205 ("Here, as the dispute centers on Hualapai trust land *and there are no obvious state interests at play*, the *Hicks* exception is unlikely to require *Montana*'s application." (emphasis added)).

[9] Defendants argue that the school districts may be tribal members for purposes of responding to employment claims in tribal court because tribal members sit on the school district boards. But this argument disregards Arizona law. *See* Ariz. Rev. Stat. § 15-101(23) ("'School district' means a political subdivision of this state . . . .").

### A. The Tribe Ceded Any Inherent Right to Exclude the School Districts from the Reservation.

"[A] portion of what had once been [the Navajo Nation's] native country" was set apart as the Navajo people's "permanent home" by the Treaty of 1868. *Williams v. Lee*, 358 U.S. 217, 221 (1959). Article II of the Treaty "provided that no one, except United States Government personnel, was to enter the reserved area." *Id.* According to Article II:

> [T]he United States agrees that no persons except those herein so authorized to do, and except such officers, soldiers, agents, and employees of the government, or of the Indians, as may be authorized to enter upon Indian reservations in discharge of duties imposed by law, or the orders of the President, shall ever be permitted to pass over, settle upon, or reside in, the territory described in this article.

Treaty between the United States of America and the Navajo Tribe of Indians, Navajo Tribe of Indians-U.S. (Treaty of 1868), art. II, June 1, 1868, 15 Stat. 667. Though the majority suggests otherwise, this provision does not grant the Navajo Nation an absolute right to exclude. In fact, the Treaty of 1868 expressly allows for entry of federal government agents for various purposes and specifically obligates the government to provide compulsory education of Navajo children in schoolhouses created by the government, by schoolteachers furnished by the government and "resid[ing] among" the Tribe. *See* Treaty of 1868, art. VI.

When the Treaty of 1868 was executed, the State of Arizona did not exist,  but Arizona took on the obligation to provide compulsory education to Navajo children as a condition of Arizona's statehood.  In the Arizona Enabling Act, Congress mandated that Arizona shall establish and maintain "a system of public schools[,] which shall be open to all the children of [Arizona]," Act of June 20, 1910, ch. 310, 36 Stat. 557, 570 (1910), and that this public school system "shall forever remain under [Arizona's] exclusive control," *id.* at 573–74.  In its constitution, Arizona both agreed to disclaim all rights to Indian land within its boundaries, Ariz. Const. art. XX, § 4, and affirmed its obligation to provide a system of public schools "open to all the children of the state," *id.* § 7.

In 1929, Congress authorized "the agents and employees of any State to enter upon Indian tribal lands, reservations, or allotments therein . . . to enforce the penalties of State compulsory school attendance laws against Indian children[] and parents."  Act of Feb. 15, 1929, ch. 216, 45 Stat. 1185.  Congress amended the act in 1946 to require tribal consent to such entry, *see* Act of Aug. 9, 1946, ch. 930, 60 Stat. 962, and the Navajo Nation consented, *see* 10 Navajo Nation Code § 503.  Nothing in subsequent legislation, *see* Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 5301 (1975), relieved Arizona of its obligation to provide a uniform, statewide system of public education.

The panel majority does not acknowledge that the State of Arizona became subject to the Treaty's specific requirement of providing government schools on Indian land.  Nor does it consider that the school districts are political subdivisions of the State of Arizona, present within the Navajo Nation for the purpose of carrying out the expressly contemplated function of educating Navajo

children.  The panel majority reasons that the Navajo Nation generally retained its right to exclude after signing the Treaty of 1868, but it offers no support for its conclusion that the Tribe may exclude school districts where, as here, the state officials are performing a governmental function on tribal land pursuant to a congressional mandate with tribal consent.

The holding in *Strate v. A–1 Contractors*, 520 U.S. 438 (1997), is instructive in this context.  In that case, a car crash involving non-Indians occurred on a highway over land that the United States held in trust for the Three Affiliated Tribes. *Id.* at 442–43.  The State of North Dakota operated and maintained the highway pursuant to a federally granted right-of-way.  *Id.*  With the Tribes' consent, Congress gave the right-of-way to North Dakota to ensure access to a federal water-resource project controlled by the Army Corps of Engineers.  *Id.* at 454–56.  Given these circumstances, the Supreme Court held that the highway was the "equivalent, for nonmember governance purposes, to alienated, non-Indian land," over which "the Tribes [could not] assert a landowner's right to occupy and exclude."  *Id.* at 454, 456; *see also Cty. of Lewis v. Allen*, 163 F.3d 509, 514 (9th Cir. 1998) (en banc) (holding that the Nez Perce Tribe ceded the right to exclude county law enforcement officers by "consenting to and receiving the benefits of state law enforcement protection").  So too here.  Like the tribe in *Strate*, the Navajo Nation has ceded the right to exclude the school districts from the Navajo oftlineReservation by: (1) expressly agreeing that the federal government must enter to provide a system of compulsory education for Navajo children; and (2) consenting to state enforcement of compulsory education on the Navajo Reservation.

**B. The Significant State Interests Present Here Render *Water Wheel* and *Grand Canyon* Inapplicable.**

The panel majority asserts that our court interprets *Hicks*, 533 U.S. 353, "as creating only a narrow exception to the general rule that, absent contrary provisions in treaties or federal statutes, tribes *retain* adjudicative authority over nonmember conduct on tribal land—land over which the tribe has the right to exclude." (Emphasis added). This flips *Montana*'s general rule on its head. The majority primarily looks to *Water Wheel* and *Grand Canyon* to support this interpretation of Supreme Court precedent, but even those outlier decisions do not permit such a cramped reading of *Hicks*, and no existing authority supports the newly minted rule that the panel majority dubs "general."[10]

First, as noted, *Water Wheel* and *Grand Canyon* recognized that *Montana*'s exceptions allowed for tribal

---

[10] The panel majority also cites one of our cases that followed close on the heals of *Hicks*: *McDonald v. Means*, 309 F.3d 530 (9th Cir. 2002). The majority describes *McDonald* as "explicitly reject[ing] the argument that *Hicks* modified or overruled *Montana* such that it would 'bar tribal jurisdiction not only over the conduct of nonmembers on non-Indian fee land but on tribal land as well.'" (Quoting *McDonald*, 309 F.3d at 540 n.9). In *McDonald*, a minor member of the Cheyenne Tribe hit a horse owned by a nonmember. 309 F.3d at 535–36. The accident happened on a road that the *McDonald* court determined was Indian land. *Id.* at 537–40. *McDonald* treated ownership of the land as dispositive and concluded that the Tribe had jurisdiction over the dispute. *Id.* at 539–40. The holding was expressly limited to a tort claim involving an accident occurring on a tribal road: "We hold that the nature and purpose of the grant [of a right-of-way over the road to the Bureau of Indian Affairs], the continuing control exercised by the Tribe over the road, and the Supreme Court's previous treatment of BIA roads supports the conclusion that the tribal court had jurisdiction to entertain [the minor

jurisdiction in what respectively amounted to a landlord-tenant dispute and an eminent domain action involving prime tribal land. As such, the disputes arose from "activit[ies] [that] interfered directly with the [T]ribe's inherent powers to exclude and manage its own lands." *Water Wheel*, 642 F.3d at 814. Second, both cases acknowledged that *Hicks* requires application of the *Montana* framework when there are "competing state interests at play." *See Water Wheel*, 642 F.3d at 810–14; *Grand Canyon*, 715 F.3d at 1204–05. Those interests were entirely absent in *Water Wheel* and *Grand Canyon*. To the contrary, the non-tribal-members in *Water Wheel* and *Grand Canyon* were private businesses engaged in consensual, for-profit transactions with the Tribes and the Tribes had overwhelming interests in the use and disposition of their tribal assets ("prime" tribal land on the banks of the Colorado River in one case, and tribal land overlooking the Grand Canyon in the other). *See Water Wheel*, 642 F.3d at 817; *Grand Canyon*, 715 F.3d at 1198. In this way, *Water Wheel* and *Grand Canyon* were consistent with *Hicks*' observation that the ownership of land is only one factor to consider in analyzing whether tribal-court jurisdiction exists, but in some circumstances land ownership may be dispositive.

The case at bar stands in stark contrast. For starters, the employees' disputes with Window Rock and Pinon School

---

Indian's suit] against the McDonald family." *Id.* at 540. *McDonald* predates our en banc decision in *Smith v. Salish Kootenai College*, where we applied the *Montana* framework to a dispute arising on tribal land and stressed that in deciding whether a tribal court has jurisdiction over a nonmember "[o]ur inquiry is not limited to deciding precisely when and where the claim arose." 434 F.3d 1127, 1135 (9th Cir. 2006) (en banc). *McDonald* and *Smith* are consistent with *Hicks*' rule that ownership of the land is only one factor to consider.

Districts have nothing to do with occupancy of the tribal land or buildings in which the school districts operate. These disputes involve entitlement to teacher merit pay provided by a state ballot measure and the rights and obligations arising from the claimants' employment contracts. The Navajo Nation Supreme Court's amicus brief asserts interests in protecting Navajo employees and students, and the tribal court's opening brief asserts interests in hearing complaints arising from employment decisions of all-Navajo school boards. But the school boards are political subdivisions of the State of Arizona, and Arizona has vitally important competing interests in the finality of its state-court judgments and its ability to enforce them. Further, Arizona's constitution mandates "the establishment and maintenance of a general and uniform public school system," Ariz. Const. art. 11, § 1, a requirement of the Arizona Enabling Act, ch. 310, 36 Stat. 557, 570 (1910). It cannot be questioned that Arizona has a compelling interest in complying with its statutory and state constitutional mandate. With these state interests at issue, *Hicks* requires us to apply *Montana* notwithstanding the holdings in *Water Wheel* and *Grand Canyon*.[11]

Our circuit is already an outlier in this area of the law. Only our circuit interprets *Hicks* to mean that the *Montana*

---

[11] The panel majority opines that there are factual disputes that the tribal court should decide to determine what state interests exist in this case. In my view, the state interests at issue are already clear and no further factual development is necessary to determine whether these state interests are sufficient to preclude tribal jurisdiction. If a State's interest in executing legal process to enforce its criminal laws was sufficient in *Nevada v. Hicks*, 533 U.S. 353, 364 (2001), it is hard to imagine how a State's interest in complying with a statutory and constitutional directive to provide a uniform system of public education to all the State's children would be insufficient.

framework need not be applied to questions of tribal jurisdiction over nonmembers in the absence of competing state interests. Today, the panel majority goes one giant step farther, interpreting *Hicks* to authorize dodging *Montana* even when there are exceptionally strong competing state interests, so long as those interests do not involve state criminal law enforcement and the dispute arises on tribal land. No case law, from any circuit, suggests this is the correct analysis.

The panel majority puts our court at odds with every other circuit that has addressed tribal jurisdiction over nonmembers after *Hicks*. Recently, the Seventh Circuit unanimously rejected the argument that notwithstanding *Hicks* and *Plains Commerce Bank*, "*Montana* only applies to situations in which tribes attempt to regulate nonmember conduct on non-Indian fee land, as opposed to tribal trust land." *Stifel, Nicolaus & Co. v. Lac du Flambeau Band of Lake Superior Chippewa Indians*, 807 F.3d 184, 206 (7th Cir. 2015). In two cases specifically involving school districts, the Eighth Circuit did not find ownership of the land dispositive, analyzed the contours of tribal jurisdiction over nonmembers within the *Montana* framework, and held that the tribal court lacked jurisdiction over tribal members' claims against the districts. *See Belcourt Pub. Sch. Dist. v. Davis*, 786 F.3d 653, 660 n.5, 661 (8th Cir. 2015); *Fort Yates Pub. Sch. Dist. No. 4 v. Murphy ex rel. C.M.B.*, 786 F.3d 662, 670 & n.6 (8th Cir. 2015).

The Tenth Circuit is in accord with the Seventh and Eighth Circuits. It considered a case in which the Navajo Nation asserted jurisdiction over county employees and concluded: "The notion that *Montana*'s applicability turns, in part, on whether the regulated activity took place on non-Indian land was finally put to rest in *Hicks*." *MacArthur v.*

*San Juan Cty.*, 497 F.3d 1057, 1069 (10th Cir. 2007). Striking out on its own, the panel majority today announces a decision that pits our circuit's case law against Tenth Circuit precedent, subjecting the Navajo Nation's tribal courts to different rules governing their assertion of jurisdiction. *See id.* at 1069–70.

Nor does the panel majority's reading of *Hicks* find support in the Supreme Court case itself. *Hicks* began its analysis with "the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." 533 U.S. at 358–59 (quoting *Montana*, 450 U.S. at 565). The panel majority characterizes *Hicks* as "suggest[ing] . . . 'the general rule of *Montana* applies to both Indian and non-Indian land.'" (Quoting *Hicks*, 533 U.S. at 360). But the Supreme Court left nothing to suggestion. *Hicks*' holding on this point is express:

> While it is certainly true that the non-Indian ownership status of the land was central to the analysis in both *Montana* and *Strate*, the reason that was so was *not* that Indian ownership suspends the "general proposition" . . . that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe" except to the extent "necessary to protect tribal self-government or to control internal relations."

533 U.S. at 359 (quoting *Montana*, 450 U.S. at 564–65).

In fact, two concurring Justices in *Hicks* emphasized their agreement with the Supreme Court majority that *Montana* governs the question of tribal civil jurisdiction over nonmembers' conduct no matter who holds title to the land

on which the conduct occurs. *See id.* at 375 (Souter, J., concurring) ("Like the Court, I take *Montana v. United States* . . . to be the source of the first principle on tribal-court civil jurisdiction . . . ."); *id.* at 387 (O'Connor, J., concurring) ("Today, the Court finally resolves that *Montana v. United States* . . . governs a tribe's civil jurisdiction over nonmembers regardless of land ownership. . . . This is done with little fanfare, but the holding is significant because we have equivocated on this question in the past.").

Essentially, the panel majority decides that the Supreme Court did not mean what it said. It relies entirely on a strained reading of the second footnote in *Hicks* where the Court explained, "Our holding in this case is limited to the question of tribal-court jurisdiction over state officers enforcing state law. We leave open the question of tribal-court jurisdiction over nonmember defendants in general." *Id.* at 358 n.2.

In this footnote, the Supreme Court focused on the status of the nonmember, not the land, foreseeing a case such as *Dolgencorp, Inc. v. Mississippi Band of Choctaw Indians*, 746 F.3d 167, 180 (5th Cir. 2014), where the Fifth Circuit was called upon to address tribal jurisdiction over a nonmember private actor rather than a government agent.[12]

---

[12] In *Dolgencorp*, the nonmember over whom the tribal court asserted jurisdiction was the operator of a Dollar General store on the Choctaw Reservation. *See* 746 F.3d at 169. The store sat on Indian land and operated pursuant to a lease agreement and business license issued by the Mississippi Band of Choctaw Indians. *Id.* After the store entered into a consensual agreement to participate in a tribal job training program that placed young tribal members in internships with local businesses, the store manager allegedly molested one of the interns on store

Footnote two lends no support to the panel majority's thesis; it only establishes that *Hicks* stopped short of announcing a bright line rule concerning tribal jurisdiction over all nonmembers. The footnote does not excuse our court from applying *Montana*.

At best, under our existing circuit precedent and Supreme Court authority, what the panel majority calls "the right-to-exclude framework" applies to nonmember conduct on tribal land only if there are no contrary treaties or statutes *and* no competing state interest at play. Here, Arizona possesses obvious competing and compelling interests. The panel majority insists that it need not decide whether *Hicks* covers state interests other than those in criminal law enforcement. But in light of the state interests in this case, *Hicks* already requires us to begin with *Montana*'s general rule that tribes lack civil jurisdiction over nonmembers unless one of the *Montana* exceptions is satisfied.

## IV. The Tribe Plainly Lacks Jurisdiction Under *Montana*.

Where no treaty or statute confers tribal jurisdiction and competing state interests are at play, federal courts assessing civil tribal jurisdiction over nonmembers look to the two exceptions described in *Montana*, 450 U.S. at 563–66. Neither exception plausibly justifies the assertion of tribal-court jurisdiction over the employees' claims against the school districts.

The first *Montana* exception provides that "[a] tribe may regulate, through taxation, licensing, or other means, the

---

premises. *Id.* The intern brought tort claims against the store operator for negligent hiring, training, and supervision. *Id.*

activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id.* at 565. *Hicks* explained that in the context of *Montana*'s first exception, "'other arrangement' is clearly another *private consensual* relationship," and rejected the argument that, by seeking a search warrant from the tribal court, the state game wardens entered into a relationship with the Tribe that gave rise to tribal jurisdiction. *Hicks*, 533 U.S. at 359 n.3. Courts of appeal, including this court sitting en banc, have uniformly interpreted *Montana*'s first exception as inapplicable to relationships between tribes or tribal members and governmental entities. *See Belcourt Pub. Sch. Dist. v. Davis*, 786 F.3d 653, 659 (8th Cir. 2015) (operating agreement between Tribe and school district); *Fort Yates Pub. Sch. Dist. No. 4 v. Murphy ex rel. C.M.B.*, 786 F.3d 662, 668 (8th Cir. 2015) (same); *MacArthur v. San Juan Cty.*, 497 F.3d 1057, 1072–74 (10th Cir. 2007) (employment contracts between tribal members and county medical clinic); *Cty. of Lewis v. Allen*, 163 F.3d 509, 515 (9th Cir. 1998) (en banc) (law enforcement agreement between the Tribe and county). *Montana*'s first exception only applies to private consensual relationships, not to relationships involving state subdivisions, such as the Window Rock and Pinon Unified School Districts.

Even if *Montana*'s first exception encompassed tribal relationships with governmental entities, it does not yield a plausible argument that assertion of tribal-court jurisdiction over the school districts' employment contracts would be proper. At bottom, the first exception is a recognition that parties who enter into consensual relationships with tribes or tribal members can fairly anticipate being subject to tribal-court jurisdiction. *See Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 338 (2008). The

school districts' contractual relationships with its seven employees provided that the employees would abide by state and federal law—and two of the employment contracts actually specified that jurisdiction for disputes arising from the contracts would lie in state and federal courts and that the contracts would be governed by state and federal law. Based on these contractual provisions, the school districts could not have anticipated that they would be hailed into Navajo tribal court.

The employees' lawsuits against the school districts and the school districts' counter suit for a declaratory judgment arise from employment contracts. Notably, the Navajo Nation is not a party to the employment contracts. The panel majority does not identify a nexus between the school districts' contact with the Navajo Nation and "the activity giving rise to this lawsuit." *See Philip Morris USA, Inc. v. King Mountain Tobacco Co.*, 569 F.3d 932, 942 (9th Cir. 2009). The Navajo Nation is a "stranger[]" to these employment relationships. *See Strate v. A–1 Contractors*, 520 U.S. 438, 457 (1997) (citation omitted). Some of the employees are not even members of the Navajo Nation.

The school districts' leases with the Navajo Nation do not provide the missing jurisdictional hook. The Supreme Court has observed that consensual relationships with tribes are not "in for a penny, in for a Pound." *See Plains Commerce Bank*, 554 U.S. at 338 (quoting *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 656 (2001)). Non-Indians, such as the school districts, do not consent to tribal-court jurisdiction over unrelated transactions by entering into separate consensual relationships, such as leases, with a tribe. *See id.* "[T]he suit must also *arise out of* those consensual contacts," *Philip Morris*, 569 F.3d at 941 (emphasis added), and there must be "a nexus to the

consensual relationship between the nonmember and the disputed commercial contacts with the tribe," *id.* at 942.

The interest asserted by the Navajo Nation is not the sort that satisfies the second *Montana* exception. The second *Montana* exception provides that a tribe "retain[s] inherent power to exercise civil authority over the conduct of non-Indians . . . when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566. Conduct giving rise to jurisdiction under this exception must "imperil the subsistence" of the Tribe such that tribal power is necessary to "avert catastrophic consequences." *Plains Commerce Bank*, 554 U.S. at 341 (citations omitted). For example, federal courts have concluded that the second *Montana* exception was at least plausibly satisfied where a non-Indian security company forcibly entered a tribal government building and seized tribal government documents; where a non-Indian trespassed on Indian land and started a forest fire; and where non-Indian landowners exercised riparian rights in a way that threatened environmental degradation of important tribal resources. *See Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe of the Miss. in Iowa*, 609 F.3d 927, 932, 941 (8th Cir. 2010) (document seizure); *Elliott v. White Mountain Apache Tribal Court*, 566 F.3d 842, 844–45, 848–51 (9th Cir. 2009) (forest fire); *Confederated Salish & Kootenai Tribes of the Flathead Reservation, Mont. v. Namen*, 665 F.2d 951, 964 (9th Cir. 1982) (riparian rights).

Courts generally do not find that private transactions, like the employment relationships here, implicate *Montana*'s second exception. In *Plains Commerce Bank*, tribal members alleged that a nonmember bank had discriminated against them in a land sale, 554 U.S. at 322, 338, but the

Supreme Court held that the Tribe lacked jurisdiction over the dispute, reasoning, "The sale of formerly Indian-owned fee land to a third party . . . cannot fairly be called 'catastrophic' for tribal self-government." *Id.* at 341 (quoting *Strate*, 520 U.S. at 454). The second *Montana* exception is narrow. *See Strate*, 520 U.S. at 459; *State of Mont. Dep't of Transp. v. King*, 191 F.3d 1108, 1114 (9th Cir. 1999).

Defendants argue that the employees' lawsuits against the school districts concern the Navajo Nation's interest in enforcing the Navajo Preference in Employment Act and thus lowering unemployment. Certainly, the welfare of a tribe is harmed by very high levels of unemployment on reservations. *See King*, 191 F.3d at 1114. But in a similar situation, we held that even the Tribe's interest in promoting local hire does not justify the assertion of tribal-court jurisdiction. *King* considered whether a tribe could regulate employment practices for hiring construction workers on a state highway running through a reservation and concluded the tribe lacked this regulatory authority. *See id.* at 1110–12. Notwithstanding the Tribe's interest in lowering unemployment, we held:

> The [Tribe] agreed to the right of way, and the State of Montana became responsible to maintain the road at its own expense. Thus, the [Tribe's] assertion of authority over the State's own employees goes beyond the internal functioning of the [T]ribe and its sovereignty and instead impinges on one of the State of Montana's sovereign responsibilities—maintaining Highway 66 and the right of way at its own expense.

*Id.* at 1114 (internal quotation marks omitted).

The panel majority does not explain why a different outcome is warranted for a dispute seeking merit pay under a state initiative, or a suit challenging a school district's grounds for terminating a teacher for failure to abide by school-district policies, or a case invoking the Navajo Preference in Employment Act. The concerns that mandated the outcome in *King* require the same result here: under the Arizona Enabling Act and the Arizona Constitution, the State bears the sovereign responsibility to maintain Arizona's school system and the Navajo Nation cannot plausibly claim jurisdiction over the contractual relationships between the school districts and their employees. The facts of this case fall well beyond the boundaries of the second *Montana* exception.

## V.  Exhaustion in Tribal Court Was Not Required.

Exhaustion in tribal court is not required if "it is plain" that tribal court jurisdiction is lacking and the exhaustion requirement "would serve no purpose other than delay." *Hicks*, 533 U.S. at 369 (quoting *Strate*, 520 U.S. at 459 n.14). Under our precedent, "it is 'plain' that the tribal court lacks jurisdiction" if jurisdiction is neither "colorable" nor "plausible." *Elliott v. White Mountain Apache Tribal Court*, 566 F.3d 842, 848 (9th Cir. 2009) (quoting *Atwood v. Fort Peck Tribal Court Assiniboine*, 513 F.3d 943, 948 (9th Cir. 2008)). Here, I would hold that jurisdiction is plainly lacking and that exhaustion in tribal court is not required.

The majority invokes the Supreme Court's general policy in favor of exhaustion, citing *National Farmers Union Insurance Cos. v. Crow Tribe of Indians*. *See* 471 U.S. 845 (1985); *National Farmers* identified the factors underpinning this policy: (1) "supporting tribal self-

government and self-determination"; (2) allowing "the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge"; (3) "allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed"; and (4) "provid[ing] other courts with the benefit of [tribal courts'] expertise in such matters in the event of further judicial review." *Id.* at 856–57. More recently, the Supreme Court emphasized that exhaustion was required in *National Farmers* "based on comity," *Strate*, 520 U.S. at 453, and a preference for "allowing tribal courts initially to respond to an invocation of their jurisdiction," *id.* at 448. The Supreme Court "d[id] not extract from *National Farmers* anything more than a prudential exhaustion rule, in deference to the capacity of tribal courts 'to explain to the parties the precise basis for accepting [or rejecting] jurisdiction.'" *Id.* at 450 (alteration in original) (quoting *Nat'l Farmers*, 471 U.S. at 857). *Strate* also made clear that exhaustion is not required when "it is plain that no federal grant provides for tribal governance of nonmembers' conduct on land covered by *Montana*'s main rule." *Id.* at 459 n.14.

The comity concerns at play in *National Farmers* are not present here. The school districts did not seek to bypass the tribal court; they filed suit in federal court only after the tribal court declined to rule on their motion to dismiss and sought to impose a costly evidentiary hearing. Importantly, for five of the seven employees, state-court decisions had already been entered, and two of the employees' contracts with the school districts expressly provided that jurisdiction shall be in state or federal court, not tribal court. Thus, it is clearly the state courts' jurisdiction that is being challenged. Although these facts alone do not foreclose application of the preference for exhaustion in tribal court, they easily

distinguish the case at bar from ones in which the Supreme Court has required exhaustion.[13]

Arizona has a compelling interest in ensuring that Navajo children have access to public education on the Navajo Reservation, and *Montana v. United States*, 450 U.S. 544 (1981), is the applicable framework. Because I would hold that jurisdiction is not colorable or plausible under *Montana*, I respectfully dissent.

---

[13] Moreover, *National Farmers* was decided thirty years ago and predates the Supreme Court's holdings in *Nevada v. Hicks*, 533 U.S. 353 (2001), and *Strate v. A–1 Contractors*, 520 U.S. 438 (1997). *See also State of Mont. Dep't of Transp. v. King*, 191 F.3d 1108, 1112–13, 1115 (9th Cir. 1999) (summarizing circumstances when exhaustion is not required). Even if tribal jurisdiction was plausible at the time *National Farmers* was decided, subsequent developments in the law render tribal jurisdiction implausible today.